OPINION OF THE COURT
 

 Wesley, J.
 

 On July 5, 1991, as part of his seizure of the New York
 
 *414
 
 Agency of Bank of Commerce & Credit International (BCCI), respondent Superintendent of Banks seized an account of the BCCI Tokyo branch at BankAmerica International (BAI) in New York. That account had received a $31 million electronic transfer from Citibank, N.Y., at the direction of appellant CITIC Industrial Bank (CITIC) on that day. CITIC had ordered the transfer prior to any seizure of BCCI’s assets pursuant to a "Eurodollar” agreement that CITIC and BCCI Tokyo had reached the previous day. In this case, CITIC challenges the Superintendent’s authority to seize these funds as assets of a foreign bank located in New York under Banking Law § 606 (4). We conclude that the statute in question gives the Superintendent sufficiently broad powers to validate the seizure at issue here.
 

 I.
 

 At the time of its collapse in July 1991, BCCI had two principal subsidiaries: BCCI, S. A., based in Luxembourg, and BCCI Overseas Ltd., based in the Cayman Islands. Almost from its inception in 1972, the bank appears to have been involved in widespread money laundering on behalf of drug lords and international terrorists. In 1988, BCCI was charged by a Federal Grand Jury with conspiring with cocaine dealers to launder millions of dollars in drug money. Under a plea agreement reached two years later, two BCCI branches pleaded guilty to reduced charges and agreed to pay $14 million in fines. In addition, as early as the late 1970’s, BCCI became involved in efforts to influence and/or gain control of U.S. banks. By 1989, there was growing evidence that BCCI actually controlled First American Bank, headquartered in Washington, D.C., in violation of Federal banking laws.
 

 By early 1991, BCCI’s troubles were coming to a head. At the request of the Bank of England, Price Waterhouse, BCCI’s English auditors, began an independent audit of the bank’s substantial operations in that country. Around the same time, the Manhattan District Attorney’s office had concluded that BCCI did, in fact, control First American Bank, and began actively pursuing indictments against the bank and its principals. Largely as a result of this investigation, on March 4, 1991, BCCI agreed to divest itself of any holdings in First American, and to close its two U.S. offices, in New York and Los Angeles. On May 18, 1991, BCCI notified CITIC of the bank’s difficulties and of its intention to close down its U.S.
 
 *415
 
 banking operations in New York and Los Angeles because of losses. At some point prior to July 1991, the BCCI New York agency stopped accepting deposits and was in the process of reducing its New York presence.
 

 Thus, by early 1991, if not years before, financial officials worldwide were on notice that BCCI was a rogue bank, and that there were substantial risks involved in doing business with it. Indeed, in
 
 United States v BCCI Holdings (Luxembourg)
 
 (961 F Supp 287 [D DC]), Judge Joyce Green held that the substantial publicity concerning BCCI’s illegal operations prior to the bank’s collapse put American Express Bank on notice that any moneys deposited with BCCI risked criminal forfeiture. Judge Green also noted that many international banks had cut their ties with BCCI based on the widespread reports of wrongdoing.
 

 Shortly before BCCI’s collapse, Price Waterhouse submitted its audit findings to the Bank of England. The report showed that the bank had been fraudulently concealing huge worldwide losses. It was this report that, on Friday, July 5, 1991, led the Bank of England to close BCCI’s operations in that country. This in turn triggered action by Luxembourg authorities, and led eventually to the bank’s worldwide shutdown. However, the bank’s operations worldwide did not shut down completely on July 5, 1991. Notably, on that very day, officials in Hong Kong declared the bank "sound and viable.” In addition, the BCCI Tokyo branch did not terminate its operations until the following Monday, and then only on instructions from the bank’s headquarters in Luxembourg. It was not until two weeks later that the government of Japan took any official action against the Tokyo branch.
 

 Despite cautions from its board of directors in 1990 and 1991 about doing business with BCCI, CITIC had been doing "dollar placements” with the BCCI Tokyo branch about twice a week throughout 1991. These dollar placement transactions involved deposits of U.S. dollars by CITIC into a BCCI Tokyo branch account at BAI in New York. During the evening of July 4th and early morning hours of July 5, 1991
 
 [1]
 
 (the Tokyo business day on July 5, 1991), CITIC and BCCI Tokyo negotiated a Eurodollar agreement, whereby CITIC agreed to transfer $31 million to the BCCI Tokyo branch over the weekend. BCCI Tokyo was to repay the money with interest the following Monday. CITIC
 
 *416
 
 apparently chose to deal with BCCI, despite the warnings from its board, because BCCI offered a higher interest rate. To carry out this transaction, CITIC agreed to deposit the $31 million into the BCCI Tokyo account at BAI in New York City as of July 5th Tokyo time. This agreement is evidenced by a telex sent by CITIC to the BCCI Tokyo branch at 7:25 p.m. on July 4th.
 

 At 3:56 a.m. on July 5th, CITIC entered and approved a funds transfer order into the Citibank computer system, ordering Citibank to transfer the funds to the BCCI Tokyo branch account at BAI in New York City. The transfer order was entered through a special terminal which Citibank had provided in CITIC’s Beijing office. Because it was the end of the July 5th business day in Tokyo, the transaction was credited in the Tokyo branch books at that time and interest was credited to CITIC.
 

 Due to the type of transaction, the transfer order was directed to Citibank operations in New York via the Clearing House Interbank Payment System (CHIPS).
 
 [2]
 
 The nature of Eurodollar transactions is that dollars are simply transferred from one New York bank Federal Reserve (Fed) account into another New York bank Fed account, regardless of where the ultimate beneficiary of the transfer is located
 
 (see,
 
 Stigum, The Money Market, at 199-202 [3d ed 1990]). The transfer order took its place in the queue of transactions which Citibank would execute that day. Citibank had a policy of deferring large transfers until the end of the business day; the transaction, therefore, kept moving to the back of the queue.
 

 On the morning of July 5, 1991, in response to the actions taken by authorities in England and Luxembourg, the New York Superintendent of Banks seized the New York agency of BCCI and took possession of the business and property of BCCI in this State on the grounds that BCCI was in an unsound and unsafe condition and could not with safety and expediency continue business
 
 (see,
 
 Banking Law § 606 [1]). Pursuant to the order of the Superintendent, a notice was posted at the BCCI New York agency at approximately 9:00 a.m. on July 5th. The New York agency’s operations were stopped, and its telex machines disabled. The Federal Reserve also issued a press
 
 *417
 
 release at 8:30 that morning announcing the seizure by the international regulators and the Superintendent. At approximately 10:40 a.m., upon learning that the BCCI Tokyo branch maintained a bank account at BAI, Michael Lesser, an Assistant Deputy Superintendent of Banks, called BAI to inform it that the Superintendent had taken over the business and property of BCCI in New York, and that no moneys should be allowed out of any BCCI accounts at BAI.
 

 At 3:10 p.m., the CITIC transfer order came up for payment in the Citibank queue. However, at that point, the CITIC account balance was insufficient to cover the transfer. Ironically, an expected transfer of $41 million into the CITIC account from an unrelated BCCI overseas transaction had not been credited in the account due to the worldwide seizure of BCCI assets. The Citibank transfer order was held in a balance retry queue. The bank’s computer periodically attempted to release all transactions or payments in the queue if a sufficient balance existed in the respective accounts. It was not until a Citibank account manager authorized an overdraft that the Citibank computer finally sent the money to BAI at 5:27 p.m. EDT. BAI received the transfer almost instantaneously, but did not credit the Tokyo branch account until 6:26 p.m.
 

 Under CHIPS rules, a stored order can be canceled by the sender (CITIC) at any time prior to acceptance by the beneficiary’s bank (BAI)
 
 (see also,
 
 UCC 4-A-211 [2]). There were no communications from CITIC to Citibank from the time Citibank received the payment order to the time the funds were actually transferred to BAI. CITIC had never previously stopped a dollar placement transaction such as this, although it was aware that other banks had done so.
 

 Prior to the start of the New York business day on July 5th, the BCCI Tokyo account at BAI contained approximately $400,000. By the end of the day, after all deposits were credited, the Tokyo branch account contained $85 million.
 
 [3]
 
 In total, BAI had $177 million on deposit in accounts of various BCCI entities. This represents a substantial proportion of BCCI assets in this country.
 

 
 *418
 
 Following the dismissal of a Federal interpleader action brought by BAI,
 
 [4]
 
 and the payment of the $177 million in BCCI assets held by BAI into a segregated account, the Superintendent by order to show cause dated July 13, 1992 brought this action seeking release of the $85 million seized from the BCCI Tokyo branch BAI account. CITIC objected to the application.
 
 [5]
 

 Supreme Court held that CITIC was entitled to a return of its $31 million under common-law restitution principles. The court treated this transaction as if it were a deposit with the seized New York agency and then, applying principles derived from common-law receivership and bankruptcy law, concluded that the Superintendent’s acceptance of the deposit was an ultra vires act. The court made no attempt to analyze the Superintendent’s actions in terms of the statutory powers granted under the Banking Law.
 

 Objecting to language in the decision indicating that the Superintendent had instructed BAI to continue to accept deposits, the Superintendent moved for reargument. Supreme Court denied the motion, holding that, regardless of whether the Superintendent issued any specific instructions, "it was the intent of the Superintendent to leave the BCCI SA account at Bankamerica open to accept deposits while precluding the pay out of monies.”
 

 The Appellate Division reversed. The Court examined the powers granted the Superintendent under the Banking Law, and concluded that Banking Law § 606 (4) (a) vests the Superintendent with broad discretion to seize the business and property of a foreign bank. The Court held that the powers granted under the Banking Law were broad enough to validate, if not require, the seizure of these funds. The Court rejected CITIC’s contentions that the contract was the result of a mistake of fact, or that CITIC was entitled to the imposition of a constructive trust, noting that CITIC had made a deliberate decision to continue doing business with BCCI despite knowledge of
 
 *419
 
 BCCI’s difficulties. The Court also noted that its decision placed CITIC in a position no better and no worse than any of the bank’s other creditors or depositors. We granted CITIC leave to appeal, and now affirm.
 

 II.
 

 Since this case involves the Superintendent’s powers to seize assets of a failed foreign bank, it is appropriate at the outset to consider the scope of the Banking Law provisions which define these powers.
 
 [6]
 
 Under Banking Law § 606 (4) (a), the Superintendent can:
 

 "take possession of the business and property in this state of any foreign banking corporation * * * upon his finding that any of the reasons enumerated in subdivision one of this section exist with respect to such corporation * * *
 
 Title to such business and property shall vest by operation of law in the superintendent and his successors forthwith upon taking possession.
 
 Thereafter, the superintendent shall liquidate or otherwise deal with such business and property in accordance with the provisions of this chapter.” (Emphasis added.)
 

 Pursuant to Banking Law § 606 (4) (c),
 

 "the phrase 'business and property in this state’ includes, but is not limited to, all property of the foreign corporation, real, personal or mixed, whether tangible or intangible, (1) wherever situated,
 
 constituting part of the business of the New York agency
 
 or branch and appearing on its books as such, and (2)
 
 situated within this state whether or not constituting part of the business of the New York agency or branch or so appearing on its books.”
 
 (Emphasis added.)
 

 Finally, Banking Law § 618 (1) provides that:
 

 "The superintendent is authorized, upon taking possession of any banking organization to liquidate the affairs thereof
 
 and to do all acts
 
 and to make such expenditures
 
 as in his judgment are necessary to conserve its assets
 
 and business.” (Emphasis added.)
 

 
 *420
 
 These provisions are worded very broadly, and give the Superintendent considerable discretion with regard to the appropriate manner of gathering, liquidating and dealing with the business and property of a failed foreign banking corporation.
 

 While this Court has previously held that the Superintendent’s powers are limited to those provided under the Banking Law, and that actions which exceed the scope of those powers are ultra vires
 
 (Matter of Tze Chun Liao v New York State Banking Dept.,
 
 74 NY2d 505), that principle is not applicable here. In
 
 Matter of Tze Chun Liao
 
 we dealt with the Superintendent’s authority to regulate the issuance of check casher licenses under Banking Law § 369 (1). Section 369 (1) provides that the Superintendent "shall * * * execute a license” where certain enumerated criteria are met. The Superintendent in
 
 Matter of Tze Chun Liao
 
 refused to issue a license to an applicant because of what he referred to as "destructive competition” (i.e., too many check cashers in a given area), a factor not mentioned in the statute. We held that, since the Legislature had specifically enumerated the factors to be considered by the Superintendent in issuing a license, the Superintendent’s denial of a license based upon a factor not contained in the statute was ultra vires
 
 (Matter of Tze Chun Liao, supra,
 
 at 510).
 

 Matter of Tze Chun Liao
 
 does not support a general proposition that the Superintendent’s powers under the Banking Law must always be narrowly construed. Rather, the case simply holds that the Superintendent’s licensing powers were narrowly defined by the provisions of the Banking Law at issue. By contrast, the provisions defining the scope of the Superintendent’s powers here are much broader. Indeed, the statute defines "business and property in this state” in extremely broad terms to include both assets of the New York agency of a foreign bank, wherever located (Banking Law § 606 [4] [c] [1]) and assets of the foreign bank located in New York State regardless of whether those assets have any business connection to the New York agency (Banking Law § 606 [4] [c] [2]). This latter provision is the focus of our inquiry.
 

 III.
 

 On its face, Banking Law § 606 (4) (c) (2) would appear to support the seizure. CITIC and BCCI Tokyo had agreed to the Eurodollar placement; both parties had taken all actions necessary to complete the first step of the transaction (deposit of
 
 *421
 
 the funds in the BCCI Tokyo bank account at BAI) prior to the Superintendent taking any action against BCCI. All that remained was for the funds to be electronically transferred into the BAI account. Because BAI was never shut down, there was no legal impediment to its acceptance of the funds
 
 {cf.,
 
 UCC 4-A-210 [3]). Once the funds were accepted by BAI, they became property located in New York of the BCCI Tokyo branch, and were subject to seizure.
 

 CITIC nonetheless contends that the transfer was invalid. CITIC argues that once the Superintendent seized the New York agency, BCCI could no longer accept deposits, and therefore the funds should be returned. This argument might, under traditional receivership principles (see,
 
 City of Mount Vernon v Best Dev. Co.,
 
 268 NY 327;
 
 Matter of International Milling Co. [Broderick],
 
 259 NY 77, 83;
 
 People v American Loan & Trust Co.,
 
 70 App Div 579,
 
 affd
 
 172 NY 371), apply to deposit tranfers to the seized business of a New York agency or branch of the foreign bank under Banking Law § 606 (4) (c) (1) (see
 
 also,
 
 UCC 4-A-210 [3]). Here, however, the seizure, pursuant to section 606 (4) (c) (2), was of the assets in an account at BAI, a fully operational unrelated banking entity, belonging to a foreign branch of BCCI which at the moment of seizure was still in operation.
 

 Section 606 (4) (c) (2) does not provide for one operative moment in time signifying the exhaustion of the Superintendent’s statutory seizure powers. Viewing the liquidation estate as being defined at the moment of the seizure of the New York agency also overestimates the ability of the Superintendent to control a multinational banking corporation. BCCI’s entire international operations were never closed by the act of any single liquidator. Thus, any attempt to define the property interests of the Tokyo branch in terms of the Superintendent’s seizure of the New York agency is entirely illusory. Certainly, it cannot be seriously contended that the property rights of the various branches of BCCI that also had contact with New York were defined exclusively by the Superintendent’s seizure of the New York agency. This reads into the statute a requirement that title to such business and property vests not upon seizure of that property but from the first seizure in time (the seizure of the agency) by the Superintendent. Such an interpretation is not supported by the language or purpose of the statute, but that is exactly where CITIC’s analysis would lead us.
 

 Section 606 (4) (c) (2) is indicative of a policy of granting the Superintendent the necessary powers to seize the assets of a
 
 *422
 
 failed foreign banking entity in order to protect the integrity, stability and reliability of the New York financial market. The efficacy of this policy is apparent when one considers that since 1945, only three banks, including BCCI, have failed, and in the first two cases, all New York creditors were paid in full, with a surplus available for the foreign liquidator in each case. In all likelihood, there will be a similar result in the BCCI matter
 
 (see,
 
 Report of Superintendent’s Advisory Committee on Transnational Banking Institutions, at 10 [Mar. 1992]).
 
 [7]
 

 CITIC’s argument also ignores the organization of an international banking corporation. In essence, a branch/agency is nothing more than a stall in the money market bazaar of international banking in New York
 
 (see,
 
 Report of Superintendent’s Advisory Committee,
 
 op. cit.,
 
 at 9). A branch or agency of a bank is not a separate entity. It has no separate capital, but rather has the entire worldwide capital of the foreign bank behind its transactions and its lending limits
 
 (see,
 
 Report of Superintendent’s Advisory Committee,
 
 op. cit.,
 
 at 8-9). Because of its lack of independent local capitalization, an agency is not allowed to accept deposits from U.S. citizens .or residents (Banking Law § 202-a [1]). On the other hand, although an agency/ branch is part of a foreign banking corporation, it is regulated as a separate entity in certain ways. A foreign bank seeking to establish an agency/branch in New York must obtain a license from the Superintendent pursuant to article 5 of the Banking Law (Banking Law §§ 200, 201). After having obtained a license, the agency is subject to close regulation and a substantial number of legal proscriptions
 
 (see,
 
 Banking Law §§ 200-209). The New York agency is the only part of BCCI that the Superintendent can control, license or regulate. But that relationship does not require us to determine that CITIC’s contract with another branch of BCCI in Tokyo (subject to Japan’s laws of commerce and banking) was incapable of performance at the time the Superintendent took control of the New York agency.
 

 In short, on the facts presented, the analogy between the Superintendent’s powers under Banking Law § 606 (4) (c) (2) and receivership law, while generally applicable to the seizure of a New York agency or branch, does not control this seizure
 
 *423
 
 of an asset located in New York, belonging to a foreign bank branch not located in New York. As applied here, the receivership analogy is incompatible with (1) the language of the statute establishing the Superintendent’s powers; (2) the policies underlying those powers; and (3) the operations of a multinational banking institution. The Superintendent had no power to control the Tokyo branch of BCCI; he did, however, have the power to seize any assets of that branch which made their way into New York. In addition, under article 4-A of the New York Uniform Commercial Code, once Citibank wired the money to BAI, CITIC could not revoke the transaction except for reasons inapplicable here
 
 (see,
 
 UCC 4-A-211 [3] [b]).
 
 [8]
 
 The agreement to deposit the funds was made and effectuated prior to the closing of the Tokyo branch. Once those funds were deposited into the BAI account, they became property in New York of BCCI Tokyo. The Superintendent then had the authority to seize the funds.
 

 Neither
 
 Friede v National City Bank
 
 (250 NY 288) nor
 
 Cragie v Hadley
 
 (99 NY 131), relied on by CITIC as authority for the proposition that the seizure of these funds was proscribed by settled principles of State law, provide persuasive authority for that proposition. Those cases involved the insolvency (Cragie) or seizure
 
 (Friede)
 
 of the bank receiving funds. In this case, the bank receiving the funds (BAI) was not insolvent. Moreover, both cases predated enactment of Banking Law § 606 (4) (c) (2), and neither involved a factual scenario remotely resembling the one at issue here.
 

 IV.
 

 CITIC also contends that it is entitled to the return of its funds under the doctrine of constructive trust. CITIC relies primarily on
 
 In re Koreag, Controle et Revision
 
 (961 F2d 341 [2d Cir],
 
 cert denied sub nom. Koreag v Refco F/ X Assocs.,
 
 506 US 865 [1992]). Koreag was the Swiss liquidator of a bankrupt foreign bank (Mebco). It asserted a claim, under section 304 of the Bankruptcy Code (11 USC), to assets held in one of Mebco’s New York bank accounts at Swiss Bank-N. Y. The claim was opposed by a New York company (Refco) which had transferred
 
 *424
 
 money into the account pursuant to currency exchange agreements with Mebco.
 
 [9]
 
 In
 
 Koreag
 
 the transactions that Refco sought to undo took place after the foreign bank had been seized by the foreign liquidator. This is a significant* difference from the case before us.
 

 Moreover, while the Second Circuit found that the equities in
 
 Koreag
 
 favored Refco
 
 (In re Koreag, supra,
 
 at 354), the facts in this case support the Appellate Division’s conclusion that the equities do not favor CITIC. CITIC cannot be portrayed as an innocent victim here. At the time it agreed to transfer funds to BCCI Tokyo, CITIC knew or should have known that BCCI was a rogue bank whose operations had come under close scrutiny by both U.S. and British authorities. Indeed, CITIC’s own board of directors had warned its personnel about extensive dealings with BCCI. Banks that chose to do business with BCCI did so at their own risk.
 

 In addition, there is no inequity in treating CITIC in the same manner as any other depositor/creditor who was unfortunate enough to have placed its money with BCCI prior to the time the New York agency was seized. Even assuming, arguendo, that there is a legal reason to distinguish between a transfer order executed at 8:59 and a transfer executed at 9:01, there is no reason to differentiate between the two based upon "equity and good conscience,” the fundamental requirement for imposition of a constructive trust
 
 (see, Simonds v Simonds,
 
 45 NY2d 233, 242).
 

 V.
 

 CITC also contends that this transaction was executed under a mistake of fact, and that recovery is warranted under the contract doctrine of impossibility / impracticability of performance. At the time that CITIC and the BCCI Tokyo branch entered into this transaction, the Tokyo branch was a fully functioning branch of an international bank. The doctrine of mutual mistake requires that the mistake exist at the time the contract is negotiated
 
 (Matter of Gould v Board of Educ.,
 
 81 NY2d 446, 453; Restatement [Second] of Contracts § 151, comment a). Clearly, the parties were not mistaken concerning the status of the Tokyo branch at the time of the contract.
 

 
 *425
 
 CITIC’s claim of impossibility/impracticability of performance is raised for the first time on appeal to this Court. Among other things, such a claim is dependent upon facts relating to the Tokyo branch’s ability and authorization to accept deposits, and upon the ability of the Tokyo branch to complete the transaction notwithstanding the Superintendent’s seizure. These issues were not litigated below, and therefore the factual record necessary for a correct dispositional analysis of these claims is not before us.
 

 This case does not involve overreaching by the State at the expense of an innocent depositor, but rather the entirely proper seizure of funds which CITIC chose to transfer to BCCI prior to its collapse. BCCI’s financial and legal troubles were well documented and well known prior to the seizure. It is clear that CITIC took a known risk, hoping to reap a larger return than it could have elsewhere. Risk assessment is always clearer after the disaster. CITIC’s attempts to invoke such hindsight cannot serve as a valid basis to grant relief.
 

 Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Titone, Bellacosa, Smith, Levine and Ciparick concur.
 

 Order, insofar as appealed from, affirmed, with cpsts.
 

 [1]
 

 . Unless otherwise indicated, all dates and times are New York Eastern Daylight Time.
 

 [2]
 

 . CHIPS is an electronic funds network that handles 95% of all international dollar transfers. All of the banks belonging to the CHIPS system must maintain a regulated presence iii New York
 
 (see, Banque Worms v BankAmerica Intl.,
 
 77 NY2d 362, 370).
 

 [3]
 

 . At the end of each day BAI would transfer funds above a given threshold balance out of its New York accounts and into interest bearing off-shore accounts. The money is always working.
 

 [4]
 

 . The Japanese liquidator filed a claim to the funds during the Federal interpleader action, but withdrew its claim on November 13, 1992. Since the settlement agreement ultimately negotiated between the United States and BCCI provides that one half of all funds will go to the worldwide liquidators, the Japanese liquidator will be able to claim some portion of the $15.5 million from this action.
 

 [5]
 

 . The Industrial Bank of Japan (IBJ) also objected, on different grounds from those presented by the CITIC claim. Both Supreme Court and the Appellate Division rejected IBJ’s claim, and IBJ did not seek leave to appeal to this Court.
 

 [6]
 

 . Unless otherwise indicated, all citations are to the statute in effect at the time of the collapse of BCCI.
 

 [7]
 

 . Following the BCCI failure, the Superintendent convened an advisory council to review the regulation of transnational banking activities in New York. The council specifically noted that the definition of assets should remain very broad for the protection of New York creditors (Report of Superintendent’s Advisory Committee,
 
 op. cit.,
 
 at 9-12, 77-78).
 

 [8]
 

 . It should be noted that where funds were mistakenly deposited into BCCI accounts, in keeping with UCC 4-A-211 (3), the Superintendent did agree to return the funds. In that regard, Lufthansa German Airlines received $4.7 million and National Westminister Bank A.G. received $66,862.13 from the Superintendent’s fund
 
 (see, Matter of New York Agency,
 
 Sup Ct, NY County, Aug. 3, 1992, Baer, J., index No. 43170/91).
 

 [9]
 

 . In essence, Mebco and Refco were swapping currencies. If Refco wanted to exchange a foreign currency for dollars, it transferred the foreign currency to a Mebco account at a designated European bank and Mebco would wire U.S. dollars to its account at Swiss Bank-N.Y. with instructions to credit a Refco account at Citibank in New York. If Refco wished to buy foreign currency, the transaction was simply reversed.