SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

Stephenson Equity Company, Plaintiff–Intervenor,

v.

CREDIT BANCORP, LTD., Credit Bancorp, Inc., Richard Jonathan Blech, Thomas Michael Rittweger and Douglas C. Brandon, Defendants.

Carl H. Loewenson, Jr., Esq., as Receiver for Credit Bancorp, Ltd., Credit Bancorp, N.V., and their subsidiaries and affiliated entities, Third–Party Plaintiff,

v.

Certain Underwriters at Lloyds, London, London Market Companies, Gulf Insurance Company, and Federal Insurance Company, Third–Party Defendants.

No. 99 CIV. 11395(RWS).

United States District Court, S.D. New York.

April 6, 2001.

514

Securities and Exchange Commission, Salt Lake City, UT, By Thomas M. Melton, Of Counsel, for Plaintiff.

Securities and Exchange Commission, New York City, By Robert Blackburn, Of Counsel, Local Counsel.

Honorable Mary Jo White, United States Attorney for the Southern District of New York City, Attorney for Intervenor United States of America, New York City, By Edward Chang, Assistant U.S. Attorney, Of Counsel, for Plaintiff–Intervenors.

Morrison & Foerster, Attorney for Receiver, New York City, By Andrew J. Fields, Oliver Metzger, Of Counsel, for Receiver.

## OPINION

SWEET, District Judge.

Carl H. Loewenson, Jr. ("Loewenson"), the court-appointed receiver (the "Receiver") for defendant Credit Bancorp, Ltd. and related entities (collectively, "Credit Bancorp") has moved for an order declaring that Credit Bancorp's customers have priority over the United States (the "Government") and the States for payment from certain property (the "Protected Property") that is either currently in the receivership estate or is anticipated will be brought into that estate, pursuant to 28 U.S.C. § 2410(a)(1) and 28 U.S.C. § 1340, and declaring that in notifying the Court and the United States of the potential for tax liability the Receiver has discharged his obligations pursuant to 31 U.S.C. § 3713(b) and may not be held liable for effectuating a court-ordered plan of partial distribution of assets in the receivership estate. For the reasons set forth below, the motion is granted in part and denied in part.

### Prior Proceedings

This action commenced on November 17, 1999, with the filing of a complaint by the Securities and Exchange Commission (the "SEC") against Credit Bancorp and its principals. The Court appointed Loewenson as Fiscal Agent for Credit Bancorp by order of November 23, 1999, and appointed him as Receiver for Credit Bancorp by order of January 21, 2000 (the "Order Appointing Receiver").

The Order Appointing Receiver directed the Receiver *inter alia* to marshal Credit Bancorp's assets. The order also directed the Receiver not to sell any securities and not to return to Credit Bancorp customers any securities or other assets deposited with Credit Bancorp, or into an account in the name of Credit Bancorp, without further order of this Court.

The Government was brought into this action in its capacity as the Internal Revenue Service (the "IRS") on November 8, 2000, when an initial motion (the "November 8 Motion") by the Receiver for a determination of priority was served on the Office of the United States Attorney for the Southern District of New York.[1]

By opinion dated November 29, 2000, *SEC v. Credit Bancorp, Ltd.*, 2000 WL 1752979 (S.D.N.Y. Nov.29, 2000) [hereinafter, *"Credit Bancorp X"*], opinion dated January 19, 2001, *SEC v. Credit Bancorp*, 129 F.Supp.2d 263 (S.D.N.Y.2001), and order dated January 19, 2001, the Court approved a plan of partial distribution of the receivership assets. The plan provides for what is in essence a pro rata return of customer-deposited property to the Credit Bancorp customers, either in the form of their deposited property, i.e., securities (where that property is under the Receiv-

---

1. The United States previously intervened in this action in order to protect a criminal investigation involving Blech, pursuant to an order of April 25, 2000, allowing the United States to "pursue a stay or other relief with respect to discovery." As used herein, the "Government" refers to the United States in its capacity as the IRS.

er's control), or in the form of cash or replacement securities (where the deposits were stolen, are missing, or are in securities accounts not under the Receiver's control). The plan requires customers to whom deposited securities are returned to make a cash "Undertaking" payment. The Undertaking proceeds are to be used to pay or secure Credit Bancorp's margin debts, to make a distribution to customers whose deposits were converted, and to provide for the ongoing cash needs of the Receivership. Implementation of the plan is subject to either a stipulation or an order by this Court granting the relief requested in the instant motion.

Subsequent to the filing of the November 8 Motion, the Receiver and the Government began negotiations regarding the subject of Credit Bancorp's tax liability, and the motion was ordered off the calendar on February 7, 2001. On February 28, 2001, the Receiver and the Government entered into a stipulation and order (the "Stipulation") which resolved certain tax matters but left others unresolved.

In the Stipulation, the Government agreed not to assert a federal tax lien for any tax "owed by Richard Blech or any other defendant" against the assets to be distributed pursuant to the plan of partial

distribution. The Government further agreed that the Receiver would not be personally liable as a consequence of proceeding with the plan for such tax liability accruing before the Receiver's appointment on January 21, 2000. The Government specifically reserved its right, however, to assert a tax lien or to assert priority as to income generated by estate assets after January 21, 2000 (the "Post–Receivership Income"), any future insurance proceeds, any securities held in accounts in the name of Credit Bancorp that are not specifically identifiable as customer-deposited securities, and any asset, property, or rights to property of defendant Richard Jonathan Blech ("Blech"). The Government also reserved its right to seek to hold the Receiver personally liable for tax liability based on such income or assets.

By motion of March 1, 2001 (the "March 1 Motion") the Receiver renewed the motion for a determination of priority with respect to those not resolved by the Stipulation. Submissions were received, and the matter was marked fully submitted on March 28, 2001.[2]

### Facts

The following facts are gleaned from the declarations, exhibits, and other submissions to the Court.[3] These submissions

---

**2.** The states of California, Kentucky, and New Jersey were served with both the November 8 and March 1 Motions but have not responded.

**3.** The Receiver, in carrying out his duties, has engaged and continues to engage in extensive discovery efforts regarding the Credit Bancorp operations. The Government to date has not engaged in independent discovery efforts, but has been given access to the Credit Bancorp documents in the Receiver's possession. The Receiver has referenced as underlying evidentiary submissions his June 21, 2000 Declaration and accompanying exhibits and appendices, and the May 12, 2000, Declaration of Andrew J. Fields and accompanying exhibits and appendix.

Neither the Receiver nor the Government has addressed whether the Receiver's motion requires the Court to enter findings of fact or, rather, whether it is more in the nature of a motion for summary judgment. Nor has the Court discovered express guidance in the case law. Typically, there is no dispute as to the essential facts where a litigant seeks a § 2410(a)(1) determination, rendering this procedural issue moot. *See, e.g., Progressive Consumers Federal Credit Union v. United States,* No. Civ. A. 9312549RCL, 1995 WL 459305, (D.Mass. May 26, 1995), *rev'd on other grounds,* 79 F.3d 1228 (1st Cir.1996); *In re Estate of Johnson,* 836 F.2d 940, 941 (5th Cir.1988); *Atlas, Inc. v. United States,* 459 F.Supp. 1000, 1005 (D.N.D.1978). In some cases the summary judgment mechanism has

include *inter alia* extensive evidence regarding the operations of Credit Bancorp.[4]

Credit Bancorp operated a fraudulent investment or "Ponzi" scheme prior to the filing of this suit by the SEC. Credit Bancorp solicited customers to deposit securities, cash, and other assets with the promise of a return in the form of a "custodial dividend" based upon a percentage of the market value of the deposits or, in the case of certain customers, to invest the customers' cash and mutual funds at above-market rates in mutual funds to be managed by Credit Bancorp.[5] Credit Bancorp represented to customers that it engaged in "riskless arbitrage" trading. At least two hundred customers took Credit Bancorp up on this offer of a "riskless" investment opportunity.

The marketing materials distributed by Credit represented and the underlying contracts entered into between Credit Bancorp and the customers provided that deposits were to be held in trust under the control of a designated trustee and were insured by Lloyds of London. Customers were specifically advised that the deposits were not the property of Credit Bancorp and that creditors of Credit Bancorp would have no recourse to the property.

Typically, customers executed two documents when they placed their deposits with Credit Bancorp: (1) a Credit Facility Agreement (the "CFA"); and (2) a Trustee Engagement Letter (the "Trustee Letter").[6] Both of these documents provided that the deposits would be held in trust, that equitable title remained with the customer, and that Credit Bancorp's sole interest in the deposit was as collateral in the event the customer borrowed from Credit Bancorp. Thus, a model CFA, included in Credit Bancorp's marketing materials, specifically provided that Credit Bancorp had a security interest in the "collateral" to be held by the "Trustee," Model CFA ¶ 2.5, and that the Trustee would not "at any time sell, trade or otherwise dispose of the Collateral, except as expressly authorized" in the agreement, *id.* ¶ 4.1. Under the model CFA, Credit Bancorp had a security interest in the collateral only to "secure the repayment of an 'Advance,'" which is defined as a payment to the customer from Credit Bancorp under the "credit facility." *Id.* ¶¶ 2.4, 2.5. Only twelve Credit Bancorp customers are indebted to Credit Bancorp for a loan made pursuant to this arrangement.

The model Trustee Letter conformed in all material respects with the model CFA. Under the Trustee Letter, the "Trustee"

been utilized, *see, e.g., Progressive Consumers Federal Credit Union v. United States*, 1995 WL 459305 (reversing grant of summary judgment to one party, and entering summary judgment for the other), while in others the court has simply determined whether or not a declaratory judgment is warranted, without discussing the nature of the factual inquiry, *see, e.g., Atlas*, 459 F.Supp. 1000. In this case, the parties agree largely but not entirely as to the material facts. The motion will be considered to be in the nature of a motion for summary judgment, and the facts set forth herein are those material facts as to which there is no genuine dispute rather than findings by the Court.

4. Some records are not presently available, as they are located in Europe and the Receiver has not yet succeeded in gaining access to them.

5. This sub-group of customers are known as the "Bob Mann" customers, and they placed deposits through their investment advisor, Advisors Capital, Inc. The facts surrounding these customers' investments differ in certain particulars from those of the other customers. However, no contention has been raised that these differences are relevant to the instant motion.

6. The Bob Mann customers executed a different set of documents.

was specifically "engaged" with regard to the transaction set forth in the Credit Facility Agreement. Model Trustee Letter at 1. The letter stated: "As the signing officer for all Credit Bancorp Ltd. trustee accounts, I represent on behalf of Credit Bancorp Ltd. and myself that the securities, as held by me in the account, are not an asset of Credit Bancorp Ltd." *Id.* The Trustee Letter further provided that:

> These securities are to be held in a Credit Bancorp Ltd. account and may not be sold or otherwise disposed of except as provided for in the [Credit Facility Agreement]. In the case of a creditor claim against Credit Bancorp and an attempt to seize the securities, I am instructed to immediately return the securities to you. At no time am I to release the securities to any third party. As the securities are being delivered as collateral for the implementation of the credit facility with Credit Bancorp, title is held by you.

*Id.*

Although certain details of the CFA and Trustee Letter differed from customer to customer as the result of individual negotiations, they share the following essential elements: (1) they created an express trust; (2) the customer deposits were to be held in accounts in which the designated trustee was the sole signatory; and (3) Credit Bancorp was not to receive any property interest in the deposit, except where loans were extended by Credit Bancorp to the customer, in which case the deposit was to serve as collateral.

The model CFA provided that Credit Bancorp would "maintain its insurance coverage under [certain enumerated policies] . . . which provide insurance coverage of the Collateral." Model CFA ¶ 4.3. The CFA also contained the following assignment provision:

> In the event of a loss of the Collateral, in whole or in part, any proceeds remitted to CBL from any insurance claims, in whole or in part, which are the subject of this transaction, are hereby assigned by Credit Bancorp to [the customer]. This assignment, although no loss has occurred or is expected to occur, is hereby declared to be part of the consideration for [the customer] entering into this Agreement.[7]

*Id.* ¶ 4.5.

Credit Bancorp did not honor the promises made in the CFA or Trustee Letter, or the representations made to the Bob Mann customers. Securities deposited by customers were pledged as collateral for margin loans from various brokerage houses or even sold outright. Cash deposited by the Bob Mann customers was immediately converted and directed to a Credit Bancorp account with Credit Suisse in Geneva (the "Credit Suisse account"). By the time the complaint in this action was filed Credit Bancorp had dissipated tens of millions of dollars of its customers' assets.

Consistent with the classic structure of a Ponzi scheme, funds in the Credit Suisse account and the proceeds of margin loans from Credit Bancorp's brokerage accounts were used for payments to customers in the form of custodial dividends, loans secured by customer deposits, and the return of deposited funds. These monies were also used for Credit Bancorp operating expenses, Credit Bancorp investments, options trading, and Blech's personal expenses.

---

7. The Receiver has not reviewed every CFA to determine whether it contains an assignment of insurance proceeds, but has determined that CFAs representing more than 80% of the deposited assets (and, accordingly, more than 80% of the losses) include the assignment provision.

In a declaration submitted by Kenneth B. Lynch ("Lynch"), who was at one time outside general counsel for Credit Bancorp, Lynch recounts conversations with Blech in which Blech described his use of funds held in Credit Bancorp accounts for his personal needs and described the source of these funds as being customer deposits or the proceeds of loans secured by those deposits:

> [Blech told Lynch that Blech took] funds from CBL's accounts, including funds from deposits by CBL's customers, for his own personal use ... [that Blech] variously used funds from customer deposits or from the proceeds of loans secured by customer deposits ... for ... personal needs ... [that] CBL's investments in the Bahia Vista Hotel, the Montecristo yacht, CBL Worldkey, and the University of Southern Europe ... came from ... funds in Credit Bancorp's accounts ... [and] that the funds in CBL's accounts came from customer deposits and from the proceeds of loans secured by customer accounts.

Lynch Decl. ¶¶ 9–11.[8]

The receivership estate includes assets spread out over two continents in a variety of forms, including securities held in accounts in the name of Credit Bancorp or the Receiver, a money market account at Citibank in New York containing the proceeds of the sale of customer securities by the Receiver, interests in the University of Southern Europe in Monaco and Hotel Bahia Vista in France, and the Montecristo, a yacht moored on the French Riviera. The cash assets and potential future cash receipts of the receivership are: (1) approximately $9 million in proceeds from the sale, pursuant to this Court's order of June 23, 2000, of 900,000 shares of the common stock of Centigram Communications Corporation ("Centigram") to Centigram, a Credit Bancorp customer; (2) the proceeds, if any, from the third-party action instituted by the Receiver against Credit Bancorp's insurers (the "Coverage Action"), which is currently pending before this Court; and (3) proceeds from the Undertaking to be paid by those customers seeking the return of their deposited securities under the plan of partial distribution.

The Receiver has not yet obtained control over certain assets, namely, securities and cash located in Europe (the "European Assets") in accounts with European financial institutions that do not recognize the Receiver's authority, and assets which Blech has claimed are his personal property.

The partial distribution plan relies on assets and income presently within the Receiver's control, the Undertaking payments, and the European assets, to fund the distribution. These assets and income are not sufficient to make the customers whole. The Undertaking payment is presently estimated at approximately 30% of the current market value of the customer's deposit.[9] Thus, the plan affords the customers a recovery rate of approximately 70%.

Credit Bancorp maintained corporate offices in California, New Jersey, and Kentucky.

At the time this action commenced, assets held by Credit Bancorp were located in California, Maryland, Nebraska, New

---

**8.** The Lynch Declaration was initially submitted in connection with the Receiver's litigation of a motion for contempt against Blech for refusing to turn over to the Receiver certain assets Blech claimed as his personal property. *See SEC v. Credit Bancorp,* 99 Civ. 11395, 2000 WL 968010 (S.D.N.Y. July 12, 2000) [hereinafter *"Credit Bancorp VI "*].

**9.** As many of the receivership assets are in the form of securities, the value of those assets and of the Undertaking percentage is not fixed.

York, and New Jersey, as well as Switzerland, the United Kingdom, and Canada.

There are presently no federal or state tax liens against Credit Bancorp or the receivership.

### Discussion

#### I. The Property As To Which The Receiver Seeks Imposition Of A Constructive Trust And The Effect Of This Remedy

The Receiver seeks a determination that the following property is subject to a constructive trust in favor of the Credit Bancorp customers and is therefore unavailable to pay any tax liability of Credit Bancorp: (1) customer-deposited assets in accounts in the name of Credit Bancorp; (2) interest and dividends earned on those assets; (3) proceeds from the wrongful sale, misappropriation, or margining of customer-deposited assets; (4) assets acquired by Credit Bancorp or Blech with customer-deposited assets, proceeds from those assets, or the pledging of any of those assets; (5) proceeds from the sale of customer-deposited assets during the course of the receivership; (6) customer Undertakings made pursuant to the plan of partial distribution and any securities or other assets acquired by the Receiver with the proceeds of such Undertakings; and (7) any insurance proceeds recovered for the loss of customer-deposited assets (collectively, the "Protected Property").[10] The Protected Property includes virtually all of the assets in the receivership estate and much of the property that it is anticipated will be delivered to the Receiver, either by operation of the plan of partial distribution or through the Receiver's marshalling activities.

The federal Debt Priority Statute, 31 U.S.C. § 3713, and the federal Lien Priority Statute, 26 U.S.C. § 6321 et seq., provide the federal government with priority over other claimants as to the payment of debts, including tax debts, owed by a debtor. See 31 U.S.C. § 3713(a)(1) (according priority to a claim of the United States under enumerated circumstances); 26 U.S.C. § 6321 (according priority to lien of the United States, except as otherwise provided in 26 U.S.C. § 6323).

If the Protected Property is subject to a constructive trust in favor of the Credit Bancorp customers, as urged by the Receiver, then Credit Bancorp has no property interest in these assets. See Part III. A., infra. The Receiver and the Government concur that under these circumstances the Protected Property could not be applied to satisfy the tax liability of Credit Bancorp or, to put it another way, the customers' claim to that property would take priority over the claim of the United States. See Gov't Mem. at 23; see generally Kennebec Box Co. v. O.S. Richards Corp., 5 F.2d 951, 952 (2d Cir.1925).[11]

#### II. Subject Matter Jurisdiction

#### A. The Jurisdictional Bar On Actions Seeking To Restrain The Assessment Or Collection Of Federal Taxes

The Government contends that this Court lacks subject matter jurisdiction to

---

**10.** Because the constructive trust is sought on behalf of all the customers, it is consistent with the holding in Credit Bancorp X, 2000 WL 1752979, that certain customers were not entitled to summary judgment requiring the return of their deposited securities to those specific customers and holding instead that equity requires essentially a pro rata distribution of the receivership assets to all the customers.

**11.** The Government maintains, however, that it would still be entitled to collect tax on income generated from these assets after the Receiver's appointment on January 21, 2000. This contention is discussed in Part III.C, infra.

grant the relief requested by the Receiver due to the jurisdictional limits imposed by the Declaratory Judgment Act, 28 U.S.C. § 2201, as well as by the Anti–Injunction Act, 26 U.S.C. § 7421.

The Declaratory Judgment Act provides in relevant part:

> In a case of actual controversy within its jurisdiction, *except with respect to Federal taxes* . . . , any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . . .

28 U.S.C. § 2201(a) (emphasis added). The Anti–Injunction Act states in relevant part that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a).

Thus, according to the Government, subject matter jurisdiction is lacking because (1) the relief sought is "with respect to Federal taxes," 28 U.S.C. § 2201(a), (2) the relief sought is purely declaratory, and (3) no exception to the jurisdictional bar applies.

■ The instant action involves an equity receivership. However, while a district court has "broad powers" and "wide discretion" to fashion relief in an equity receivership, *see, e.g., SEC v. Elliott,* 953 F.2d 1560, 1566 (11th Cir.1992), a court cannot expand its jurisdiction by creating a receivership, *see Orth v. Transit Inv. Corp.,* 132 F.2d 938, 945 (3d Cir.1942); *First Nat'l Bank in Albuquerque v. Robinson,* 107 F.2d 50, 54 (10th Cir.1939). Therefore, it must be ascertained whether there is an independent basis for subject matter jurisdiction over the Receiver's motion that does not run afoul of the jurisdictional bar.

**B. *Subject Matter Jurisdiction Under The Quiet Title Provision Of 28 U.S.C. § 2410(a)(1)***

The Receiver maintains that subject matter jurisdiction over this motion exists pursuant to the quiet title provision of 28 U.S.C. § 2410, and 28 U.S.C. § 1340. Section 2410 is not itself a jurisdictional statute but, rather, pertains to whether the United States has waived sovereign immunity with respect to the matter at issue, and provides in relevant part:

> [T]he United States may be named a party in any civil action or suit in any district court, . . . to quiet title to . . . real or personal property on which the United States has or claims a mortgage or other lien.

28 U.S.C. § 2410(a)(1).

Section 1340 is a jurisdictional statute, and provides that the district courts "shall have original jurisdiction of any civil action arising under any Act of Congress for providing internal revenue . . . ." 28 U.S.C. § 1340. Section 1340 provides a basis for subject matter jurisdiction over actions against the United States to quiet title pursuant to § 2410(a)(1). *See, e.g., Aqua Bar & Lounge, Inc. v. IRS,* 539 F.2d 935, 937 (3d Cir.1976).

The Receiver contends that the motion for a determination of priority is proper under § 2410(a)(1) because, in seeking a determination that the customers have an interest in the Protected Property that takes priority over a lien interest by the Government, he is seeking to "quiet title" to that property. 28 U.S.C. § 2410(a)(1).

The Government has not challenged the Receiver's contention that, if sovereign immunity has been waived with respect to this motion under § 2410(a)(1), then there is subject matter jurisdiction under § 1340. *See* 28 U.S.C. §§ 2410(a)(1), 1340. Rather, the Government's position is that

§ 2410(a)(1) does not apply to the motion and, therefore, the Receiver cannot rely on this provision to escape the jurisdictional bar imposed by the Declaratory Judgment Act and the Anti–Injunction Act.[12]

The jurisdictional bar imposed by the Declaratory Judgment and Anti–Injunction Acts is directed at suits whose "objective ... [is] to restrain the assessment and collection of taxes ...." *Alexander v. "Americans United"*, 416 U.S. 752, 760, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974) (analyzing Anti–Injunction Act). The Supreme Court has instructed that "the principal purpose of ... [the jurisdictional bar is] the protection of the Government's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference ...." *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974) (analyzing Anti–Injunction Act). The jurisdictional bar promotes this congressional policy by forcing "a person whose sole claim is that a federal tax assessment was not valid in fact and law must 'pay first and litigate later.'" *Falik v. United States*, 343 F.2d 38, 41 (2d Cir.1965) (citations omitted) (analyzing § 2410(a)(1) and Declaratory Judgment Act).

■ Section 2410(a)(1) does not constitute a waiver of sovereign immunity with respect to challenges to the merits of the federal government's tax assessment or lien. *See, e.g., Progressive Consumers*, 79 F.3d at 1232–33 (Section 2410(a)(1) does not encompass actions seeking to extinguish federal tax liens as invalid); *Aqua Bar*, 539 F.2d at 938 (Section 2410 does not permit suit by taxpayer to "challenge merits of the tax assessment underlying the lien"); *Falik*, 343 F.2d at 41 (same).

■ However, § 2410(a)(1) does serve as a waiver of the United States' sovereign immunity with respect to disputes concerning the priority of competing liens. *See, e.g., Progressive Consumers*, 79 F.3d at 1232–33 ("[S]ection 2410(a)(1) controversies encompass disputes concerning both the 'validity and priority of liens' as distinguished from actions seeking 'their extinguishment' ....") (citation omitted); *Johnson*, 836 F.2d at 946 (plaintiff sought relief which "would seem to fit within our earlier definition of a section 2410 quiet title action, to wit: a determination that a tax lien does not exist, has been extinguished, or is inferior in rank") (emphasis in original); *ContiMortgage Corp. v. United States*, 109 F.Supp.2d 1038, 1041 (D.Minn.2000) ("As the Plaintiff in the present matter is seeking a declaration of the priority of its mortgage over the United States' tax lien, subject matter jurisdiction is proper pursuant to 28 U.S.C. § 2410(a)(1).").

■ Suits to determine lien priority under the quiet title provision of § 2410 are not barred by the Declaratory Judgment or Anti–Injunction Acts. *See Progressive Consumers*, 79 F.3d at 1234 (Declaratory Judgment Act does not bar quiet title action seeking determination of lien priority); *Johnson*, 836 F.2d at 948 (neither Declaratory Judgment nor Anti–Injunction Act bar quiet title suits that do not contest merits of underlying assessment); *Aqua Bar*, 539 F.2d at 940 (same); *McEndree v. Wilson*, 774 F.Supp. 1292, 1297 (D.Colo. 1991) (§ 2410(a)(1) provides exception to Declaratory Judgment Act jurisdictional bar); *see also Harrell v. United States*, 13 F.3d 232, 234 (7th Cir.1993) (Anti–Injunction Act does not bar § 2410 challenge to government's method of collecting assessments).

---

**12.** The scope of the bar and any exceptions thereto under these two acts are the same for purposes of the instant dispute. *See Johnson*, 836 F.2d at 948; *Aqua Bar*, 539 F.2d at 940.

The Government maintains, however, that the Receiver's characterization of his motion as merely relating to the priority of liens is inaccurate. Citing *"Americans United"*, 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518, and *Bob Jones Univ.*, 416 U.S. at 725, 94 S.Ct. 2038 the Government maintains that the Receiver's real "objective . . . [is] to restrain the assessment and collection of taxes," *"Americans United"*, 416 U.S. at 760, 94 S.Ct. 2053 since what the Receiver seeks is "advance assurance," *Bob Jones Univ.*, 416 U.S. at 738, 94 S.Ct. 2038 that Credit Bancorp's tax liabilities cannot be collected from the receivership estate. Indeed, avers the Government, the Receiver "would not be interested in obtaining the declaratory and injunctive relief requested," *"Americans United"*, 416 U.S. at 761, 94 S.Ct. 2053 if this were not his purpose.

The reduction of the pool of possible assets available for collection by the government, however, is precisely the result in the cases that have found lien priority challenges to fall within § 2410(a)(1), since a finding that the moving party's lien is superior to the government's lien necessarily means that the assets available to the government to satisfy any tax assessment or collection are decreased. *See, e.g., Progressive Consumers*, 79 F.3d at 1232; *Johnson*, 836 F.2d at 945–46; *ContiMortgage Corp.*, 109 F.Supp.2d at 1041. "Admittedly, any challenge to the validity of a federal tax lien and sale indirectly interferes with the tax collection process which [the Declaratory Judgment Act and the Anti–Injunction Act] are designed to protect from undue litigation outside the Tax Court." *Aqua Bar*, 539 F.2d at 940. Nonetheless, § 2410(a)(1) permits litigants to seek declaratory relief against the government regarding the priority of competing liens. *See id.*

Moreover, neither *"Americans United"* nor *Bob Jones Univ.* involved § 2410(a)(1) or a declaration involving the priority of liens. *See "Americans United"*, 416 U.S. at 756–57, 94 S.Ct. 2053 (litigant sought declaration that IRS's administration of statute was erroneous or unconstitutional); *Bob Jones Univ.*, 416 U.S. at 738–41, 94 S.Ct. 2038 (university sought declaration that non-profit status erroneously revoked by IRS). Thus, while a general lesson may be drawn from these cases that courts should carefully evaluate whether a litigant is in fact seeking to restrain tax assessment or collection, regardless of how the litigant characterizes its efforts, the analysis in these cases does not apply to the instant dispute.[13]

The Government also relies on the Second Circuit's decision in *Falik*, 343 F.2d 38, in which the court rejected the taxpayer's contention that her suit was a quiet title action that was not barred under the Declaratory Judgment Act. *Id.* at 42. In *Falik*, however, the taxpayer sought to remove a tax lien on her home because, she argued, she did not owe the taxes underlying the lien. *See id.* at 39. Thus, she was questioning the validity of the underlying assessment rather than seeking a determination of lien priority. *See id.* at 42. Similarly, in *Laino v. United States*, 633 F.2d 626 (2d Cir.1980), also cited by the Government, the taxpayer sought to

---

**13.** The same is true for the other cases cited by the Government in that they did not involve the exception created by the quiet title provision. *See Jacobson v. Organized Crime and Racketeering Section of the United States Dep't of Justice*, 544 F.2d 637 (2d Cir.1976); *Black v. United States*, 534 F.2d 524 (2d Cir. 1976); *Hoffman v. United States*, 130 B.R. 526 (W.D.Wis.1991); *Thompson/Center Arms Co. v. Baker*, 686 F.Supp. 38 (D.N.H.1988); *Chapman v. Alexander*, 421 F.Supp. 930 (W.D.La.1976), *aff'd*, 552 F.2d 367 (5th Cir. 1977).

enjoin the government's tax collection effort on the basis that the assessment "lacked any basis in fact," *id.* at 628, and was "null and void," *id.* at 626.[14] Thus, these cases merely illustrate the difference between claims that challenge the assessment and collection of taxes and claims that do not, but do not apply here. Indeed, *Falik* specifically recognized that suits involving the priority of liens are authorized, pursuant to § 2410(a)(1). *See* 343 F.2d at 42.

■ The Receiver does not dispute that Credit Bancorp may owe substantial federal tax liability. What the Receiver seeks, however, is a determination regarding who holds property interests in the Protected Property. Thus, the Receiver has not challenged an underlying tax assessment or collection effort but, rather, seeks a determination regarding the priority of competing liens and, under the authorities just discussed, there is subject matter jurisdiction over this motion.

The Government also objects, however, that the Receiver cannot rely on § 2410(a)(1) because the Government has not actually made an assessment and does not presently have a lien on the receivership estate. Therefore, according to the Government, the United States neither "has nor claims a lien," 28 U.S.C. § 2410(a)(1), on the Protected Property.

■ It is a "basic rule of statutory interpretation [to] avoid reading statutory language in a way that would in any way make some of its provisions surplusage." *United States v. Martinez–Santos*, 184 F.3d 196, 204 (2d Cir.1999). Under the plain language of the statute, to "claim" a lien must be different than to "have" one, as both possibilities are expressed. *See* 28 U.S.C. § 2410(a)(1). Yet the Government's argument reduces the meaning of "has or claims a lien" to "has ... a lien." Since there is no dispute that the Government does not have a lien on the receivership estate, the question is whether it "claims" one within the meaning of the statute.

The Government points out that in all of the § 2410(a)(1) cases relied upon by the Receiver, a federal tax lien had been asserted. *See Progressive Consumers*, 79 F.3d at 1230; *Johnson*, 990 F.2d at 42; *Johnson*, 836 F.2d at 942; *ContiMortgage Corp.*, 109 F.Supp.2d at 1040; *Stackhouse v. Morgan*, No. 2:99 CV 1537, 1999 WL 1427759, at *1 (E.D.Va. Dec. 15, 1998); *Sandclay Trucking v. Free Piping*, No. 95–702–CIV–ORL–18, 1996 WL 511673, at *1 (M.D.Fla. June 24, 1996). Unsurprisingly, none of these cases addressed the meaning of the "claims a ... lien" terminology.

In *Mongelli v. Mongelli*, 849 F.Supp. 215 (S.D.N.Y.1994), which comes the closest to the facts of this case, the court held that § 2410(a)(1) did not apply because the government had only a "potential lien" on the defendant's property rather than an actual one. *Id.* at 219. The decision does not discuss the "claims ... a lien" language, however, and there is no indication that any of the parties raised this portion of the statute to the court. *See id.* at 218–19.[15] Thus, *Mongelli* is not persuasive au-

---

14. Similarly, many of the non-quiet-title cases cited by the Government concern direct challenges to the assessment or collection of taxes. *See "Americans United"*, 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518 (challenging revocation of letter ruling on tax exempt status); *Jacobson*, 544 F.2d 637 (challenging refusal to allow taxpayers to pay tax debt in install-

ments); *Hoffman*, 130 B.R. 526 (challenging IRS claim that taxpayer responsible for collection and payment of federal payroll taxes).

15. *Mongelli* also arose in a somewhat different context. The government's lien was not a federal tax lien but, rather, was based on a judgment obtained against the defendant for

thority for the proposition that a lien must actually be in place in order to § 2410(a)(1) to apply.

The Government also relies on *Bradley, Arant, Rose & White v. United States,* 802 F.2d 1323, 1325 (11th Cir.1986), and *Stewart v. United States,* 242 F.2d 49 (5th Cir.1957). *Bradley* fails to address the specific statutory language at issue here and is distinguishable on its facts. *See* 802 F.2d .at 1325 (§ 2410(a)(1) does not apply to assets in which the United States has an ownership interest, as compared with a lien interest). *Stewart* merely stated generally that "§ 2410(a)(1) ... applies only to suits relating to government liens ...." 242 F.2d at 50 n. 2. Therefore, these cases do not warrant the conclusion that the present lack of a lien means that § 2410(a)(1) does not apply.

■ It is another basic canon of statutory interpretation that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Harris v. Sullivan,* 968 F.2d 263, 265 (2d Cir.1992) (internal quotation marks and citation omitted); *see United States v. Dauray,* 215 F.3d 257, 260 (2d Cir.2000) (when interpreting statute's plain meaning court "consider[s] the ordinary, common-sense meaning of the words").

Section 2410 does not provide a definition of the term "claims," or explain the difference between having and claiming a

lien. *See* 28 U.S.C. § 2410(a)(1). Nor has a definition of this term elsewhere in the tax code been identified by the parties or this Court. As the term is not "otherwise defined," the Court must look to its ordinary meaning. The ordinary meaning of the verb "to claim" is "to assert; to urge; to insist." *Black's Law Dictionary* at 247 (6th 3d.1990). Thus, to claim something falls short of actually having it.

Although no tax liability has yet been assessed against Credit Bancorp, there is a potential that a substantial assessment will be made in the future. This potential is far from speculative. After negotiations between the Receiver and the Government, and the entry of the Stipulation, the Government specifically reserved its rights to assert a tax lien or to assert priority as to certain receivership assets, including but not limited to the Post–Receivership Income. While the Government avers that the Receiver's predictions of the potential Credit Bancorp tax liability are exaggerated, it is apparent that the Government contemplates that some tax liability will result from the assets not included in the Stipulation. Moreover, the practical effect of the Government's position is much the same as would be the effect of an actual lien in that the Receiver cannot implement the partial distribution plan until the issue of the Government's right to these assets is resolved.[16]

---

outstanding civil contempt fines for refusal to testify before a grand jury. *See* 849 F.Supp. at 218–19. The government had intervened in divorce proceedings brought against the defendant by his wife and was acting as the judgment creditor of the defendant in those proceedings. *See id.* The court held that whether or not the government had a lien was governed by state law, and focused on whether under that law the lien was "inchoate." *Id.* at 219.

**16.** The Receiver avers that the Government has avoided actually imposing a lien, despite

its statutory right, under 26 U.S.C. § 6871(a), to impose an immediate assessment (which serves as a lien pursuant to 26 U.S.C. § 6322), upon learning of the appointment of a receiver for a taxpayer—"presumably," the Receiver avers, to prevent the § 2410(a)(1) waiver provision from being triggered. The niceties of the tax code not having been further explored by the parties, however, it is not clear whether as a practical matter the Government may be hindered to some extent by the difficulties of calculating an assessment in what is a complex tax case and where some

"Jurisdictional grants waiving sovereign immunity are ordinarily interpreted narrowly." *Roco Carriers, Ltd. v. M/V Nurnberg Express*, 899 F.2d 1292, 1295 (2d Cir. 1990) (*citing United States v. Sherwood*, 312 U.S. 584, 590, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). It is neither necessary, nor would it be wise, to attempt to determine the outer contours of the meaning of "claims . . . a lien," that is, the threshold of government conduct, or some other criterion, that would trigger application of this term. The conclusion that the circumstances of this case fall within that term, however, is supported by the statutory language, interpreted in light of applicable rules of statutory construction and the case law. Moreover, application of the quiet title provision to this case comports with the policy goals underlying that provision. *See Johnson*, 836 F.2d at 944 (discussing legislative history of quiet title provision and observing that it was enacted "in response to the recognized need for a way to force disputes over government tax liens to resolution, rather than leaving the United States in complete control of the timing") (internal quotation marks and citation omitted).

Therefore, there is subject matter jurisdiction over the Receiver's motion for a determination of priority, pursuant to 28 U.S.C. § 2410(a)(1) and 28 U.S.C. § 1340.

The Receiver also maintains that subject matter jurisdiction exists under the exception to the jurisdictional bar set forth in *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 6–7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962) (exception to bar where it is "clear that under no circumstances could the government ultimately prevail"

and "equity jurisdiction otherwise exists"); *see also Laino v. United States*, 633 F.2d 626, 629 (2d Cir.1980), as well as the exception set forth in *South Carolina v. Regan*, 465 U.S. 367, 378, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984) (jurisdictional bar does not "apply to actions brought by aggrieved parties for whom [Congress] has not provided an alternative remedy"). Jurisdiction having been found on other grounds, however, these alternative bases will not be addressed.

### C. *Subject Matter Jurisdiction Over The Receiver's Request For Relief Regarding His Personal Liability*

In addition to seeking a determination of priority, the Receiver has moved for a declaration that he has satisfied his obligations under the Federal Debt Priority Statute, 31 U.S.C. § 3713(b), and therefore that he may not be held personally liable for tax liabilities incurred by Credit Bancorp or the receivership on account of his discharging this Court's orders, including by implementing the partial distribution plan.

The Government contends that, while the Federal Debt Priority Statute does not refer to taxes as such, the declaratory relief sought is "with respect to Federal taxes," 28 U.S.C. § 2201(a), and therefore the Court lacks subject matter jurisdiction.

■ The Government does not provide much detail for its view that this second form of relief "relates to federal taxes." However, the Government's position can be understood based on its citation to *Botta v. Scanlon*, 314 F.2d 392, 393–94 (2d

---

records are not available. *See* 26 U.S.C. § 6871 (permitting immediate assessment of "any deficiency (together with all interest, additional amounts, and additions to the tax provided by law) determined by the Secretary"). The fact that under the tax code a lien

arises at the time an assessment is made, *see* 26 U.S.C. §§ 6321 and 6322, however, does provide further support for the interpretation that an assessment need not have been made in order for the Government to "claim" a lien under § 2410(a)(1).

Cir.1963), in which the Second Circuit held that a suit seeking to restrain the United States from collecting a penalty assessment under § 6672 of the tax code was barred by the Anti–Injunction Act. *See id.*

In *Botta,* the plaintiffs maintained that § 6672 penalty assessments are not taxes and, therefore, that the jurisdictional bar did not apply. *See* 314 F.2d at 393. However, in light of the fact that under § 6672 the penalty imposed is equal to the amount of the unpaid tax, the court held that the penalty provision was "simply a means for ensuring that the tax is paid," *id.* at 393, so that collection of the penalty "[could] no more be prevented by injunction than could the original tax," *id.* at 394.[17] Applying this reasoning here, it seems that the Government's contention is that § 3713(b), by imposing personal liability on the receiver, is simply a means for ensuring that any tax owed by the Credit Bancorp estate is paid, so that collection of this tax from the Receiver cannot be barred anymore than can the assessment of the tax.

Although the Government has not mentioned it, the Anti–Injunction Statute also expressly references "suits to restrain assessment or collection . . . of . . . the amount of the liability of a fiduciary under section 3713(b) of title 31, United States Code . . . ." 26 U.S.C. § 7421(b)(2).

No authority has been identified which addresses whether a motion such as the one here is subject to the jurisdictional bar against suits seeking to restrain the assessment or collection of taxes. However, the nature of the dilemma facing the Receiver here was noted in *Johnson,* 836 F.2d 940, which involved a motion for a determination of priority under § 2410(a)(1). In *Johnson,* the Fifth Circuit held that the jurisdictional bar did not apply to an action by an estate executor seeking a determination of lien priority, including a federal tax lien, under § 2410(a)(1). *See id.* at 946–47. In so holding, the court observed that "[w]ithout a judicial determination of rights in the property, the executor faces the prospect of steering a precarious course between the Scylla and Charybdis of potentially competing . . . disbursement obligations," *id.* at 947, and "[i]t seems clear that in carrying out his disbursement obligations, the executor, in the absence of a judicial declaration of priorities, may be unable to act without subjecting himself to an unacceptable risk of liability," *id.* at 947 n. 16 (*citing* 31 U.S.C. § 3713(b)). The case does not indicate, however, that the executor separately requested declaratory relief regarding his obligations under § 3713(b).

One theory for jurisdiction over the Receiver's motion is that the issue of whether he has satisfied his obligations under § 3713(b) is inseparable from the issue of lien priority under § 2410(a)(1). In *Johnson,* the court concluded that the "precarious course" faced by the executor, 836 F.2d at 947, supported the exercise of jurisdiction over his § 2410 action so that he could obtain the protection of a "judicial declaration of priorities," *id.* at 947 n. 16. Thus, implicitly, the court recognized that the effect of finding jurisdiction under § 2410(a)(1) would be to protect the executor from the dangers he would otherwise face under § 3713(b)—assuming, of course, that he complied with the judicially determined priorities. *See id.* In this case, the Receiver seeks to make that implicit protection explicit. Therefore, this situation

---

**17.** The Court also relied on the fact that the tax code expressly states that " 'except as otherwise provided, any reference to "tax" imposed by this title shall be deemed also to refer to the penalties and liabilities provided by this subchapter (including § 6672).' " *Botta,* 314 F.2d at 393 (*quoting* 26 U.S.C. § 6671(a)).

is different from the one in *Botta*, 314 F.2d 392, and there is subject matter jurisdiction to consider the Receiver's request for relief as to his personal liability.

The Receiver has also proposed that there is no alternative means for resolving the potential conflict between implementing the partial distribution plan and the incurrence of extraordinary personal liability, so that the *Regan* exception applies. *See Regan*, 465 U.S. 367, 104 S.Ct. 1107, 79 L.Ed.2d 372. In *Regan*, the Supreme Court articulated a second exception to the injunction prohibition, in addition to the one set forth in *Williams Packing*, according to which the prohibition does "not . . . apply to actions brought be aggrieved parties for whom [Congress] . . . has not provided an alternative remedy." *Id.* at 378, 104 S.Ct. 1107.

The *Regan* exception is very difficult to satisfy. In the case itself, the plaintiff, because of its posture in relation to the challenged tax provision, quite literally lacked any means of obtaining an adjudication of that challenge other than an injunctive suit. *See* 465 U.S. at 378–80, 104 S.Ct. 1107. Moreover, the Supreme Court took note that it had rejected arguments that the injunction prohibition does not apply where the only alternative remedy is a refund action—even where a refund action is not "adequate" as a practical matter because the taxpayer, under the circumstances, will suffer irreparable injury by having to pay first and seek a refund later. *Id.* at 376, 104 S.Ct. 1107 (citations omitted).

The Receiver points out that the Government has failed to suggest any alternative remedy and avers that he knows of no way other than this motion to challenge the potential for his personal liability. The Receiver has not addressed the issue of refund suits. The Receiver's concern, of course, is his ability to challenge this po-

tential liability before he is put in the position of having incurred it. The question is whether under these circumstances there is no alternative remedy within the meaning of *Regan*, 465 U.S. 367, 104 S.Ct. 1107, 79 L.Ed.2d 372.

It will be assumed arguendo that the Receiver, like any one else, could "pay first and litigate later." *Falik*, 343 F.2d at 41. In that sense, there is an alternative remedy, i.e., a method by which the Receiver could ultimately obtain adjudication of his claim. As the *Johnson* court observed, this is an untenable position for the fiduciary of an estate such as a receiver or executor. 836 F.2d at 947.

This is a special type of case. It is the court that imposed the receivership, and the court that appointed the Receiver. If the Receiver cannot obtain review of his motion regarding personal liability then he has two choices. He can implement the partial distribution plan as presently structured, but at the risk of extraordinary personal liability. Or he can set aside reserves from the receivership funds to provide for the eventuality that this personal liability will come to pass, and to cover that liability. Neither of these courses of action is tenable. Thus, the effect of not affording the Receiver a way to have the personal liability issue determined at this stage would be to bring the receivership and any partial distribution under the receivership to a halt. The available alternatives are thus not merely inadequate as a practical matter but defeat the very purpose of the receivership. Therefore, applying *Regan* to the facts of this case leads to the conclusion that there is subject matter jurisdiction under the *Regan* exception.

Jurisdiction having been found for the reasons set forth above, the Receiver's contention that there is also subject matter jurisdiction over his request for § 3713

relief under *Williams Packing* will not be addressed.

### III. *The Ripeness Of The Dispute As To The "Unmarshalled Assets"*

The Government contends that the Receiver's motion is not ripe insofar as it relates to "unmarshalled assets," and therefore may not be considered. The Receiver responds that neither his motion nor the question of ripeness turns on the distinction between marshalled and unmarshalled assets.

■ Ripeness is a constitutional prerequisite to the exercise of jurisdiction by federal courts. *See Nutritional Health Alliance v. Shalala,* 144 F.3d 220, 225 (2d Cir.1998). "In evaluating whether a declaratory judgment action is ripe, we consider (1) the fitness of the issues for judicial review, and (2) the injury or hardship to the parties of withholding judicial consideration." *Id.* (*citing Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). "The ripeness doctrine's 'basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.' " *Gary D. Peake Excavating Inc. v. Town Bd. of the Town of Hancock,* 93 F.3d 68, 72 (2d Cir.1996) [hereinafter *"Peake Excavating "*] (*quoting Abbott Labs.,* 387 U.S. at 148, 87 S.Ct. 1507).

■ The Government defines the unmarshalled assets as (1) assets claimed by Blech as his personal property but found to have been purchased or maintained, at least in part, with Credit Bancorp funds (the "Blech Assets"), *see S.E.C. v. Credit Bancorp VI,* 2000 WL 968010, at \*15–\*19, and (2) any proceeds recovered under Credit Bancorp's insurance policies.[18] Gov't Mem. at 19. According to the Government, the issue of priority as to these assets is not fit for review because many documents and records belonging to Credit Bancorp are in Europe and presently out of reach, rendering the factual record incomplete. Moreover, the Government maintains, neither the Receiver nor the Credit Bancorp customers will suffer hardship if review is not obtained at this juncture because the unmarshalled assets are not part of the partial distribution plan.

The Protected Property is defined according to its source rather than according to whether it is currently within the Receiver's control. The definition corresponds to the principle that whether a constructive trust may be imposed over any or all of the property depends on the source of that property. *See* Part III.A., *infra.*[19] Whether to impose a constructive trust issue does involve factual questions. However, with respect to the insurance proceeds, as further explained herein, the determinations needed to resolve the Receiver's motion are primarily legal in nature and further factual development

---

**18.** There are other assets which are not presently within the Receiver's control—including the European assets, which are part of the plan of partial distribution. The Government has not included these other assets in its definition of "unmarshalled assets." In addressing the ripeness question, the Receiver has made certain contentions which go to these other assets not within his control, including that hardship will result absent review because the partial distribution plan cannot be implemented. These contentions are well taken, but need not be addressed given the narrower definition of "unmarshalled assets" employed by the Government.

**19.** *But see* Part. III.B.2., *infra* (discussing insurance proceeds). .

would not aid in their resolution.[20] *See Able v. United States*, 88 F.3d 1280, 1290 (2d Cir.1996) (constitutional challenge to statute was "ready for judicial determination" because presented issues that were "primarily legal, and not factual, in nature"). Thus, this issue is fit for review. As for the Blech Assets, factual questions do come to the fore. As discussed later in this opinion, *see* Part IV.B.1, *infra*, the record is not sufficiently developed.

With respect to the issue of hardship, the Receiver has expended and must continue to expend substantial customer-deposited resources if he is to recover insurance proceeds from the Credit Bancorp insurers.[21] If review were not *obtained* until after these efforts were concluded, and if at that point it were determined that the Government has priority over the customers as to those assets, the resulting hardship to the customers would be severe because significant receivership assets would have been expended in vain from the Receiver's and customers' perspective. *See Peake Excavating*, 93 F.3d at 72 (developer of landfill could challenge ordinance prior to expending funds on developing landfill where ordinance could restrict operation of landfill because "[i]f we [the court] uphold the ordinance, Peake will be able to cut his losses by halting his efforts to obtain a . . . permit; if we invalidate the ordinance, Peake can continue with the . . . permitting process, knowing that obtaining the . . . permit would not be in vain"). Under these circumstances, the Receiver, acting on behalf of the customers, need not " 'await the consummation of threatened injury to obtain preventative relief.' " *Valmonte v. Bane*, 18 F.3d 992, 999 (2d Cir. 1994) (*quoting Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 67 L.Ed. 1117 (1923)).[22] Thus, this is more than a mere "abstract disagreement," and the matter is ripe for review.

There is a similar type of hardship with respect to the Blech Assets, in that the Receiver has expended significant assets attempting to marshal these assets, and must expend more if he is to continue those efforts.[23] However, the hardship is less and, as explained herein, the factual record is not adequately developed. Therefore, this issue is not ripe for review.

The Government concedes that the issue of whether taxes owed on income generated from receivership assets since the appointment of the Receiver, and whether the Receiver has satisfied his obligations under 31 U.S.C. § 3713, are ripe.

---

**20.** Indeed, a different theory is relied upon to resolve the insurance proceeds issue. *See* Part III.B.2, *infra*.

**21.** The Receiver is litigating a complex third-party action against the Insurers.

**22.** The Government points out that no tax has yet been assessed, and maintains that even after an assessment the Receiver could take advantage of administrative procedures and, perhaps, ultimately obtain a favorable determination by the IRS. *See Jolles Foundation v. Moysey*, 250 F.2d 166, 169 (2d Cir. 1957) (finding no "actual controversy" where no tax had been assessed or even threatened); *Kittay v. Giuliani*, 112 F.Supp.2d 342, 348–49 (S.D.N.Y.2000) (" 'The potential for such administrative solutions confirms the conclusion' that the issues are not yet ripe.") (*quoting Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 297, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)). However, for the reasons just explained, these facts do not render the insurance proceeds matter unripe.

**23.** Past efforts include litigating a contempt motion and obtaining a money judgment for contempt against Blech, and partly litigating an appeal by Blech to the Second Circuit Court of Appeals, and present efforts include an endeavor to enforce the judgment in France, pursuant to a Certification of Judgment for Registration in Another District issued by this Court.

## IV. The Determination Of Priority

### A. The Law Governing The Determination Of Priority And Imposition Of A Constructive Trust

"The threshold question ... in all cases where the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had 'property' or 'rights to property' to which the tax lien could attach." *Aquilino v. United States,* 363 U.S. 509, 512, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960).[24] Thus, the determination of whether the United States may assert priority over the customers as to the Protected Property for payment of any potential tax liability on the part of Credit Bancorp is a two-step inquiry. First, the nature of the taxpayer's interest in the property must be determined, which is done by looking to state law. *See United States v. National Bank of Commerce,* 472 U.S. 713, 722, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985).[25] Second, federal law is applied to determine whether the state law right constitutes attachable property under the federal statutes. *See National Bank,* 472 U.S. at 722, 105 S.Ct. 2919.

The "general rule" under both state and federal choice of law rules is that "the law of the situs of the property, and therefore the trust, governs [the] determination" of whether property in the possession of a debtor is held in constructive trust. *Howard's Appliance,* 874 F.2d at 93–94 (applying New York choice of law rules in analogous bankruptcy proceeding context) *(citing Collier on Bankruptcy* ¶ 544.02 at 544–13 to 544–14 (explaining that "the tendency of the courts is to treat the law of the situs of property at the commencement of the case as governing")); *but see Morson v. Second Nat'l Bank of Boston,* 306 Mass. 588, 29 N.E.2d 19, 20–21 (1940) (where property was in form of shares rather than "ordinary tangible chattel," court applied law of state of incorporation rather than situs of stock certificates to determine validity of transfer).

Under the laws of the five states in which Credit Bancorp assets were located at the time this action commenced—New York, New Jersey, Nebraska, Maryland, and California—assets are subjective to a constructive trust when "a party ... is holding property under such circumstances that in equity and good conscience he ought not to retain it." *Counihan v. Allstate Ins. Co.,* 194 F.3d 357, 361 (2d Cir. 1999) (internal quotation marks and citation omitted) (applying New York law); *see ESI, Inc. v. Coastal Power Prod. Co.,* 995 F.Supp. 419, 436 (S.D.N.Y.1998) (applying New York law); *In re DeLauro,* 207 B.R. 412, 415 (Bankr.D.N.J.1997) (applying New Jersey law and stating, "[g]enerally all that is required to impose a constructive trust is a finding that there was some wrongful act, usually, though not limited to, fraud, mistake, undue influence ... which has resulted in a transfer of property") (internal quotation marks and citation omitted); *Wait v. Cornette,* 259 Neb. 850, 612 N.W.2d 905, 911 (2000) (applying Nebraska law and stating, "[a] constructive trust is imposed when one has acquired

---

**24.** *Aquilino* concerned the federal Tax Lien Statute, 26 U.S.C. § 6321 *et seq.,* but the same rule applies under the Debt Priority Statute, 31 U.S.C. § 3713, because the government may not impress one person's property to pay the debts of another. *See Kennebec,* 5 F.2d at 952.

**25.** The determination of whether to impose a constructive trust on property in the debtor's possession is a determination of the nature of the interests in the property. *See, e.g., Carter v. United States,* Nos. C–79–2690, C–79–2935, 1981 WL 1953, at *6 (N.D.Cal.1981); *see also In re Howard's Appliance Corp.,* 874 F.2d 88, 93 (2d Cir.1989) (applying same rule in analogous context of bankruptcy proceeding)

legal title to property under such circumstances that he or she may not in good conscience retain the beneficial interest in the property. In such a situation, equity converts the legal titleholder into a trustee holding the title for the benefit of those entitled to the ownership thereof"); *Edwards v. Gramling Eng'g Corp.*, 322 Md. 535, 588 A.2d 793, 801 (1991) (applying Maryland law and stating, "[e]quity creates [a constructive trust] where a person holding title to a property is subject to an equitable duty to convey it to another person on the ground that he would be unjustly enriched if he were permitted to retain it"); Cal. Civ.Code § 2224 ("One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the things gained, for the benefit of the person who would otherwise have had it."); Cal. Civ.Code § 2223 ("One who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner."); *In re Advent Mgmt. Corp.*, 178 B.R. 480, 486 (B.A.P. 9th Cir.1995), *aff'd*, 104 F.3d 293 (9th Cir.1997) (applying California law).

■ The imposition of a constructive trust does not mean that the beneficiary of the trust actually owns the stolen property—rather, the constructive trust is a remedy intended to protect a person with greater rights in property from a person who, though in actual possession of the property, has a lesser right to it. *See* William R. Fratcher, V *Scott On Trusts*

§ 462 at 303–05 (4th ed.1989) [hereinafter *"Scott On Trusts"*] ("Where ... the person who fraudulently receives or possesses himself of trust property is converted ... into a trustee, the expression is used for ... describing the nature and extent of the remedy against him, and it denotes that the parties entitled beneficially have the same rights and remedies against him as they would be entitled to against an express trustee who had fraudulently committed a breach of trust.") (internal quotation marks and citation omitted).

■ A constructive trust is a powerful remedy, as it cuts off the rights of general creditors as well as the rights of the United States, notwithstanding the Federal Debt Priority statute, 31 U.S.C. § 3713(a)(1).[26] *See, e.g., United States v. Paige*, No. 81–2066, 1985 WL 2335, at *5 (D.D.C. July 30, 1985) (IRS could not assert tax lien as to property held by embezzler but subject to constructive trust in favor of embezzler's victim); *United States v. Fontana*, 528 F.Supp. 137 (S.D.N.Y. 1981) (same, applying New York law); *Trustees of the Clients' Sec. Fund of the Bar v. Yucht*, 243 N.J.Super. 97, 578 A.2d 900, 908 (1989) (same, applying New Jersey law); *Brown v. Coleman*, 318 Md. 56, 566 A.2d 1091, 1097 (1989) (same, applying Maryland law); *FTC v. Crittenden*, 823 F.Supp. 699, 704 (C.D.Cal.1993) (same, applying California law).[27]

■ The claimant to a constructive trust must establish the facts giving rise to the trust by clear and convincing evidence. *See Caballero v. Anselmo*, 759 F.Supp. 144,

---

26. The Government avers that the rights of the United States may be cut off "under some circumstances," but does not explain when such circumstances would not exist. Gov't. Mem. at 24. The Government does not challenge the proposition, however, that in the instant case the imposition of a constructive trust in favor of the customers would cut off its rights to assert a tax lien as to the property

subject to the trust. Thus, this opinion does not purport to decide whether there are circumstances in which the United States would be able to assert its rights even in the face of a constructive trust.

27. Nebraska authority on this issue has not been located.

147 (S.D.N.Y.1991) (applying New York Law); *Taylor v. Fields,* 178 Cal.App.3d 653, 224 Cal.Rptr. 186, 194 (1986) (applying California law); *Peninsula Methodist Homes & Hosps. v. Cropper,* 256 Md. 728, 261 A.2d 787, 793 (1970) (applying Maryland law); *ProData Computer Servs. v. Ponec,* 256 Neb. 228, 590 N.W.2d 176, 181 (1999) (applying Nebraska law); *Gray v. Bradley,* 1 N.J. 102, 62 A.2d 139, 140 (1948) (applying New Jersey law).

 "It is hornbook law that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of a wrongdoer." *United States v. Benitez,* 779 F.2d 135, 139 (2d Cir.1985). "The owner may follow and recover the property or its proceeds as long as it has not been transferred to a bona fide purchaser." *Carter,* 1981 WL 1953, at *10.

 In cases involving Ponzi schemes, courts have taken a broad view of the constructive trust remedy, and the tracing requirement, in order to effectuate the goal of returning to the victims of the fraud their stolen property or proceeds of that property. For example, in *Benitez,* 779 F.2d 135, the Second Circuit held that it was reasonable to impose a constructive trust on assets held by a Ponzi scheme perpetrator (and order a pro rata distribution to the victims) even though the assets were "not traceable," *id.* at 140, to the victims' property, based on circumstantial evidence from which it could be inferred that these assets were derived from the fraud, *see id.* at 141; *see also United States v. Schwimmer,* 968 F.2d 1570, 1584 (2d Cir.1992) ("To the extent this Court tolerated a very relaxed tracing standard in *Benitez,* it was with an eye to permitting the District Court to exercise this general, victim-compensation function, without being hampered by strict definitions of property rights."). Similarly, in *Carter,* the

IRS objected that its tax lien took priority over the fraud victims in part on the theory that each victim was required to trace its specific funds to the specific assets seized to satisfy that lien. *See* 1981 WL 1953, at *4. The Court rejected this argument, imposed a constructive trust in favor of the victims as a whole, and concluded that a federal tax lien could not attach to the trust property. *See id.* at *8–*9.

**B. Application Of The Governing Law To The Protected Property**

In violation of the CFAs and Trustee Letters, the assets deposited by the Credit Bancorp customers were not held in trust. Rather, these assets were misappropriated, either by conversion of the property itself or by subjecting that property to liens securing margin loans that were then used for purposes inconsistent with the CFA and Trustee Letter. Moreover, the CFA and Trustee Letter specifically provided that the customer deposits were not the property of Credit Bancorp and that title to the property did not pass to Credit Bancorp. These are the type of circumstances under which imposition of a constructive trust has been found warranted. *See Benitez,* 779 F.2d at 139–40 (affirming imposition of constructive trust on assets of Ponzi scheme in favor of victims where perpetrator falsely represented funds would be used as down payments for loans, and noting result would be same under either New York or federal common law); *Carter,* 1981 WL 1953, at *8–*9 (imposing constructive trust on assets of perpetrator of Ponzi scheme in favor of victims where perpetrator represented assets would be held in trust, applying California law); *see also, e.g., Dennis v. United States,* 372 F.Supp. 563, (E.D.Va.1974) (swindler's personal assets, seized by authorities, subject to constructive trust for benefit of victim

and not to IRS levy for taxes owed by swindler).

The Government maintains, however, that certain categories of the Protected Property, namely, the Blech Assets and the insurance proceeds, are not subject to a constructive trust because they are not sufficiently traceable to customer deposits.

### 1. The Blech Assets

With respect to the Blech Assets, the Government contends that the evidence must show, but does not, that the Blech Assets were acquired solely with customer-deposited assets—as compared with being acquired in part with such assets, or being merely maintained with such assets. Therefore, the Government avers, the customers may be entitled to a different remedy, such as an equitable lien, but not to a constructive trust, with respect to these assets. *See generally Scott on Trusts* §§ 463, 512 (where wrongdoer uses funds to maintain or improve property, victim entitled to equitable lien but not constructive trust).[28]

The documentary evidence demonstrates the flow of funds held by Credit Bancorp into the Credit Suisse account and out of that account into Blech's personal accounts—and the use of funds from the Credit Suisse account and Blech's personal accounts to purchase or maintain, in whole or in part, the Blech Assets. The Government avers, however, that the evidence also shows that at least some of these assets were acquired with funds of unknown origin. In support of this contention the Government points to, for example, records indicating that in the period prior to September 24, 1998, the only customer-traceable deposit into the Credit Suisse account was for an amount that was far less than the expenditures on the Blech assets made during that same period. The Government also points out that the Receiver, in submissions made in connection with the Coverage Action, has stated as an undisputed fact that Credit Bancorp engaged in certain legitimate business activities—which might, by implication, be a source of funds other than the customer deposits.

The Lynch Declaration provides additional evidence that Blech Assets were purchased—not just in part, and not merely maintained—with customer deposits or with funds that derive from those deposits. The declaration describes admissions by Blech as to his use of funds from Credit Bancorp accounts for his personal needs, including to purchase some of the specific assets included in the Blech Assets, and as to the source of the funds in the Credit Bancorp accounts, i.e., customer deposits and proceeds of loans secured by customer accounts. *See* Lynch Decl. ¶¶ 9–11.[29] However, this additional evidence does not adequately fill the existing evidentiary gaps.

■ The Government has cited several cases which stand for the proposition that where the assets of a fraud victim have been commingled with assets that do not derive from the fraud, then the victim may obtain a constructive trust only as to those assets which he can trace specifically. *See*

28. An equitable lien would not defeat the Government's statutory priority. *See generally United States v. Gilbert Assocs.*, 345 U.S. 361, 366, 73 S.Ct. 701, 97 L.Ed. 1071 (1953).

29. With respect to Credit Bancorp's "legitimate business activities," counsel for the Receiver represents that the Receiver has not identified any net income to Credit Bancorp other than from the customer deposits or proceeds thereof. The evidence submitted by the Receiver in connection with this motion, however, including his Declaration, while certainly consistent with this representation does not specifically address this issue.

*Efron v. Kalmanovitz,* 249 Cal.App.2d 187, 57 Cal.Rptr. 248, 254 (1967); *Brown v. Coleman,* 318 Md. 56, 566 A.2d 1091, 1099–1101 (1989); *In re Estate of Redpath,* 224 Neb. 845, 402 N.W.2d 648, 650 (1987); *Equity Sav. & Loan Ass'n v. Chicago Title Ins.,* 190 N.J.Super. 340, 463 A.2d 398, 400 & n. 1 (1983); *see also Cunningham v. Brown,* 265 U.S. 1, 11, 44 S.Ct. 424, 68 L.Ed. 873 (1924). In those cases, there was no question but that the defrauder had assets that came from legitimate sources and had then mingled those assets with the fraudulently-derived ones. *See, e.g., Efron,* 57 Cal.Rptr. at 254; *Brown,* 318 Md. at 72–73, 566 A.2d 1091; *Redpath,* 402 N.W.2d 648–49. This is not such a case, and moreover there is authority for the proposition that a somewhat relaxed tracing standard applies. *See* Part IV. A., *supra.*

However, even applying a relaxed standard, based on the current state of the record, the Receiver is not entitled to the relief sought at this juncture. Therefore, his motion in this respect is denied as not ripe for review, with leave to renew in the future.

### 2. *The Insurance Proceeds*

#### a. *Constructive Trust*

With respect to the insurance proceeds, the Government contends that no constructive trust may be imposed because the Receiver has failed to trace these assets to customer-deposited assets.[30] The Receiver, relying on *Counihan,* 194 F.3d 357, responds that tracing is not the issue

because a constructive trust is warranted on the theory that the insurance proceeds, if any, represents compensation for losses to the customers' deposits as a result of the fraud.

In *Counihan,* the Second Circuit, applying New York law, held that the government, rather than the insured, was entitled to the fire insurance proceeds of the insured's property where the property had been forfeited to the federal government, and imposed a constructive trust on the proceeds for the benefit of the government. *See* 194 F.3d at 361–62. Under the circumstances, the insurance proceeds represented "a portion of the value of the Property that the United States would have received but for the arson .... [Thus a] constructive trust is properly imposed ... in order to make the government whole for its loss of the value of the Property; unjust enrichment would otherwise result." *Id.* at 361. *Counihan* relied not on a tracing theory but, rather, on the principle that "[a] constructive trust is an equitable remedy, necessarily flexible to accomplish its purpose," i.e., unjust enrichment. *Id.; see also Simonds v. Simonds,* 45 N.Y.2d 233, 240, 408 N.Y.S.2d 359, 380 N.E.2d 189 (N.Y.1978) (imposing constructive trust on life insurance proceeds promised to former wife in settlement agreement, though she was not named as beneficiary, because "inability to trace plaintiff's equitable rights precisely should not require that they not be recognized"); *Rogers v. Rogers,* 63 N.Y.2d 582,

---

**30.** The Government has not specified exactly what kind of tracing it means, and the issue becomes complicated by the fact that insurance proceeds are an unusual type of asset. It may be that the Government is referring to the tracing of premium payments, although generally even where such tracing can be accomplished the constructive trust is imposed only to the extent of such payment.

*See generally Scott on Trusts* § 508.4 at 574–84 accomplished the constructive trust is imposed only to the extent of such payment. *See generally Scott on Trusts* § 508.4 at 574–84 (discussing generally tracing requirement where wrongdoer uses money of constructive trust claimant to pay premiums on insurance policy obtained by wrongdoer, e.g. life insurance).

586, 483 N.Y.S.2d 976, 473 N.E.2d 226 (N.Y.1984) (accord).

This reasoning is applicable here, particularly in light of the fact that the insurance policies as to which the proceeds were assigned were to cover losses to customer deposits—thus, these proceeds represent "the value [or a portion thereof] of the property that was destroyed." *Counihan,* 194 F.3d at 362. Absent imposition of a constructive trust, there is a danger of unjust enrichment to the benefit of Credit Bancorp and at the expense of the customers. This is because, while it is the Government and the customers who are presently battling over this asset, the equities at issue are actually between Credit Bancorp and the customers: if Credit Bancorp's tax liability can be paid from the insurance proceeds, then Credit Bancorp as a taxpayer benefits at the expense of the customers.[31] Indeed, the inequity becomes even more stark when one considers that the customers are in effect bearing the burden of recovering the insurance proceeds because it is receivership funds that are being used to pay for the Coverage Action.[32]

■ The Government points out, however, that the Receiver has not explained why the insurance proceeds issue should be governed by New York law, given that the policy was underwritten by Lloyds of London on behalf of a Netherlands corporation and the policies themselves provide for the application of United Kingdom law.

The Receiver objects that the Government fails to explain why any alternate law would govern or to show that any other jurisdiction would follow a contrary rule. It is the Receiver's burden, however, to show that a constructive trust should be imposed. Thus, while there is little reason to think that the result would differ under any state law that might apply—nor even that it would differ under the law of the United Kingdom[33]—imposition of a constructive trust is not warranted in this instance.

**b. *The Assignment Of The Insurance Proceeds***

The Receiver maintains that there is an alternative basis upon which the customers' interest in the insurance proceeds must take priority over that of the Government, namely, the previous assignment in the CFA of these proceeds to the customers by Credit Bancorp. The Government does not dispute the proposition that a previously-made valid assignment of a Credit Bancorp asset would take priority over a subsequently-asserted federal tax lien. However, the Government objects that at the time of the alleged assignment Credit Bancorp had nothing more than a future interest in the proceeds of the insurance policies and, therefore, could not make a valid assignment of that right.

As in other contexts, determining whether a federal tax lien may attach to the insurance proceeds, pursuant to 26

---

**31.** The Government benefits too, of course, but that does not mean that for purposes of the constructive trust issue the equities are between the customers and the Government.

**32.** Indeed, application of a tracing rule seems misplaced where the insurance coverage relates to the very assets to which the party in possession of those assets is not entitled. *See Counihan,* 194 F.3d 357; *see also Scott on Trusts* § 508.4 at 584 and n. 16 (discussing Georgia case in which woman obtained land

by fraud but paid premiums on insurance policy on buildings on land with own money—fraud victim entitled to constructive trust as to both land and insurance proceeds).

**33.** *See Scott on Trusts* § 462 at 309–10 and n. 10 (explaining that English courts have often imposed constructive trust in situations of unjust enrichment in accordance with views of this remedy in United States).

U.S.C. § 6321, first requires a determination of the taxpayer's property rights in the insurance proceeds under the relevant state law. *See United States v. Bess*, 357 U.S. 51, 55, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958) (construing predecessor statute and holding that "[s]ince § 3670 creates no property rights but merely attaches consequences, federally defined, to rights created under state law, ... we must look first to [the beneficiary's] right in the policies as defined by state law."). The CFA, which is the contract in which Credit Bancorp assigned its rights to the insurance proceeds, provides that all issues or claims arising from or relating to the CFA are governed by Kentucky law. Therefore, this is the law that determines the nature of Credit Bancorp's, and the customers', property rights in the insurance proceeds.

 Neither the parties nor this Court have located Kentucky case law regarding the nature of rights arising from an assignment of insurance or other contingent proceeds. Other case law, however, has recognized the general principle that where a taxpayer has previously assigned its contractual rights in an asset to a third party a tax lien for liability owed by the taxpayer may not attach to that asset— even though at the time of assignment the taxpayer's right to the asset was contingent on some future event. For example, in *United States v. General Motors Corp.*, 929 F.2d 249 (6th Cir.1991), the court construed an assignment of future (as well as present) accounts receivable under Michigan law and held that "[t]he assignment extinguished any property rights [of the assignor] in those receivables to which the subsequent federal tax lien might have

attached." *Id.* at 249, 253. In *Fidelity–Philadelphia Trust Co. v. Smith*, 356 U.S. 274, 78 S.Ct. 730, 2 L.Ed.2d 765 (1958), the Supreme Court held that the deceased taxpayer, by assigning away her rights and benefits under her life insurance policy before her death, "had divested herself of all interests in the insurance policies ... [so that] [t]he assignees became the 'owners' of the policies before her death," *id.* at 278, 78 S.Ct. 730, and it was proper for the proceeds not to have been included in the decedent's estate tax return, *see id.* at 277–78, 78 S.Ct. 730. *See also Key West Rest. & Lounge, Inc. v. Connecticut Indem. Co.*, 54 B.R. 978, 989–90 (N.D.Ill. 1985) (applying Illinois law to hold that, where after fire insured made series of assignments to rights in proceeds from fire insurance policy, "[t]ax assessments and liens after the fire attached only to [the insured's] property and rights to property' which had not been previously conveyed to an assignee"); *but see MDC Leasing Corp. v. New York Prop. Ins. Underwriting Assoc.*, 450 F.Supp. 179, (S.D.N.Y.1978) (under New York law, assignees' interest in insurance proceeds was inchoate until judgment or appropriation of the proceeds in favor of the assignor had been obtained, and therefore did not take priority over tax lien), *aff'd*, 603 F.2d 213 (2d Cir.1979) (unpublished table decision).[34]

Leading treatises on contract law confirm that where there is a contract in place governing the rights held by the assignor, even where those rights are conditional or contingent, a valid assignment may be effectuated. *See* E.A. Farnsworth, III *Farnsworth On Contracts* § 11.5 at 88 (2d ed.1990) [hereinafter *"Farnsworth On*

---

**34.** In *Key West*, the court noted that in determining the priority of a federal tax lien, "[t]he starting point is not an analysis of whether and when the assignees' liens became 'choate.' Rather, the issue is what 'property and rights to property' belonging to [the taxpayer/assignor] could be subject to federal tax liens under 26 U.S.C. § 6321." 54 B.R. at 987. The court in *MDC Leasing* began from a different starting point, namely, an analysis of when the assignees' claims became choate under state law. *See* 450 F.Supp. at 180–81.

*Contracts*"] ("Whatever the impediments to the assignment of future rights, they do not apply to an obligee's assignment of a right under an existing contract that has not yet ripened into a right to demand performance because it is conditioned on some event that has not yet occurred."); *Restatement (Second) Contracts* § 321 cmt. a at 321 ("This Section does not apply to rights in existence at the time of assignment. Such rights are assignable under the rules stated in §§ 317 [governing the assignment of rights] and 320 [governing the assignment of conditional rights] even though they are conditional or have not matured. For this purpose rights arising under a contract are treated as existing from the moment of its formation, even though the chance is slight that there will ever be a duty of immediate performance."). Indeed, the treatises help to clarify that rights under an existing contract, even though contingent, are different from the "future right" theory advanced by the Government. *See Farnsworth On Contracts,* § 11.5 at 88; *Restatement (Second) Contracts* § 321 cmt. a at 28; *but see Don King Productions, Inc. v. Thomas,* 945 F.2d 529, 531, 534 (2d Cir.1991) (under New York law, assignment of right to payment conditioned upon occurrence of a prizefight at unspecified time in future was true future interest and could not be assigned despite existence of contract between fighter and promoter).[35]

▪ At the time the CFAs were executed, Credit Bancorp's right to collect on its insurance policies was, of course, contingent upon future events—not least of which was the occurrence of the loss itself. However, this right was governed by then-existing contracts—the insurance policies. Thus, rather than an assignment of a future interest, what occurred was an assignment of a then-existing right, albeit one that was Credit Bancorp divested itself of its interest in the insurance proceeds at the time it assigned them through the CFAs, and has no property interest in those proceeds to which a federal tax lien may attach based on Credit Bancorp's tax liability.

Finally, the Government points to the language in the CFA providing that "no loss has occurred or is expected to occur" as further evidence that there was no valid assignment. The *Restatement* provision regarding the assignment of future interests provides that "an assignment of a right to payment *expected to arise* out of an existing employment or other continuing business relationship is effective." *Restatement (Second) of Contracts* § 321(1) (1979) (emphasis added). According to the terms of the CFA itself, the Government avers, there was no expectation that the right to payment would arise. However, as just explained, the Restatement provision governing future interests is inapposite. Moreover, the statement that no loss was expected to occur is entirely unremarkable given that what at issue was an insurance policy. As with all insurance, while the customers had no expectation of loss, they nevertheless sought protection should such loss occur. This language does not vitiate the assignment.

### C. *Income Earned On The Receivership Assets After The Appointment Of The Receiver*

The Government contends that the customers are not entitled to a constructive

---

**35.** The Government in part relies on *Don King,* 945 F.2d 529, as well as a Kentucky case, *Hunt v. Smith,* 191 Ky. 443, 230 S.W. 936 (1921). *Don King* does reflect a different rule, under New York law, than the one applied here. *See* 945 F.2d at 534. *Hunt* is inapposite, as it involved an attempt to assign the mere "expectancy [at law] of an heir apparent to inherit his father's estate," 230 S.W. at 938, and thus concerned a true future interest as that term is employed herein.

trust with respect to the Post–Receivership Income. The Government has identified two possible sources of such income: interest and dividends paid on these assets, and income generated through the sale or distribution of these assets. According to the Government, the proposition that this income belongs to the customers, while the tax on the income is owed by Credit Bancorp, is "extraordinary."

In the Stipulation, the Government agreed that assets deposited by customers prior to the Receiver's appointment, as well as income generated from those assets such as dividends, interest, and gains, are not subject to attachment by the United States to satisfy any tax liability of Credit Bancorp but, rather, should be returned to the customers. The Government characterizes the pre-Receivership assets and income as "embezzlement income" which is attributable for tax purposes to Credit Bancorp, and therefore a proper basis for Credit Bancorp tax liability, but which should be returned to the customers rather than being subject to a tax lien to satisfy such liability. *See, e.g., Paige,* 1985 WL 2335, at *4–*6 (money illegally obtained by embezzler was "includable within his gross income and taxable to him in the year it was received," but as "no title is acquired by the embezzler," a constructive trust in favor of victims would be imposed on property purchased with monies).

The Post–Receivership Income is different in the Government's eyes. Therefore, avers the Government, tax liability for that income might be owed by any of various entities or persons, including Credit Bancorp, each Credit Bancorp customer individually, or some third entity such as Credit Bancorp's customers collectively, or the receivership as a qualified or designated settlement fund, pursuant to 26 U.S.C. § 468B and 26 C.F.R. § 1.48B.

The Government, in focusing on the fact that the identity of the proper taxpayer for the Post–Receivership Income is not presently known, elides the critical issue for resolution of the Receiver's motion. Fundamentally, the motion is addressed not to who owes tax liability for any given assets or income but, rather, to who has a property interest in such assets or income.

█ As explained in more detail above, it is a fundamental principle of constructive trust law, and one which the Government acknowledges, that property subject to a constructive trust cannot be used to pay taxes owed by the wrongdoer. *See, e.g., Dennis,* 372 F.Supp. at 567; *Paige,* 1985 WL 2335 at *5. The proposition that the proper taxpayer in respect of certain income might be one party while the owner of that income—pursuant to a constructive trust—might be another party is not extraordinary but, rather, is an expression of this basic principle. *See Dennis,* 372 F.Supp. at 566 ("The policy that a person whose income is so increased [through fraud] is to be taxed on that increase, based as it is on factors of economic benefit ... does not resolve the question of the proper object of government levy ....").

The Government avers that the case law relied upon by the Receiver does not support his motion because in some of those cases the tax was based on "embezzlement income" of the wrongdoer, i.e., monies or assets obtained by the wrongdoer during the course of the fraudulent scheme, *see Paige,* 1985 WL 2335, at *4; *Carter v. United States,* No. C–79–2690 TEH, 1981 WL 1953, at *1 (N.D.Cal. Mar.27, 1981); *Atlas,* 459 F.Supp. at 1002; *First Nat'l Bank of Cartersville v. Hill,* 412 F.Supp. 422, 423–24 (N.D.Ga.1976); *Dennis,* 372 F.Supp. at 565; *Brown,* 566 A.2d at 1095, while in other cases the source of the tax liability is not identified, *see United States v. Fontana,* 528 F.Supp. 137, 139 (S.D.N.Y.

1981); *Yucht,* 578 A.2d at 902. These cases, however, do not help the Government because they do not reflect any dispute or discussion as to income accruing, so to speak, post-embezzlement, and nothing in the reasoning of these cases warrants the distinction the Government wishes to make here.

■■■■ Moreover, at least in New Jersey, there is authority directly on point, and under which post-receivership interest earnings on fraudulently-obtained monies were subject to a constructive trust along with the rest of what the Government terms "embezzlement income." *See Miller,* 243 N.J.Super. at 88, 578 A.2d 887 (describing how receiver transferred receivership funds into money market account, and allocating interest earned on that account based on proceeds of embezzled funds to total amount subject to constructive trust). This result is entirely consistent with the general rule that "where a constructive trustee has invested such funds or has purchased other property, the real owner can follow it wherever it can be traced." *Atlas,* 459 F.Supp. at 1005.

If the Receivership had not been created then the entity in control of income derived from the customer-deposited assets would still be Credit Bancorp, and the Government does not contend that under those circumstances such income would be subject to a tax lien to satisfy Credit Bancorp tax liability. Thus, there is a certain incongruity to the Government's position that income accruing after the receivership could be attached for that purpose. A

primary purpose of the receivership, after all, is to preserve and marshal the stolen property for the benefit of the victims. A constructive trust in favor of the customers is warranted with respect to the Post–Receivership Income because that income represents the proceeds of customer property obtained through the Credit Bancorp fraud.[36]

With respect to the Government's hypothesis that the proper taxpayer is the receivership itself, the Receiver maintains that the receivership is not a taxable entity separate and apart from Credit Bancorp. Even if it were, however, this would not mean that the Post–Receivership Income would be subject to attachment to satisfy tax liability of the Receivership. A primary purpose of the receivership being to provide recompense to the customers, it would be both illogical and inequitable to conclude that the scope of a constructive trust in favor of the fraud victims is less where a receivership is imposed than where, for example, the defrauder makes a receivership unnecessary by cooperating.

With respect to the hypothesis that the proper taxpayer might be the individual customers or some collective of customers, the Receiver has sought no relief regarding customer tax liability and takes no position on that issue. Nor need he do so. The instant proceedings do not concern the customers' tax liability, if any, on their investments with Credit Bancorp either before or after the imposition of receivership, including based on any distributions received under the partial distribution

---

**36.** It is recognized that the Government maintains that it has not conceded that the pre-receivership assets and income—covered by the Stipulation—are subject to a constructive trust. Rather, avers the Government, it "agrees only that, in good conscience and as a matter of policy, the assets covered by the Stipulation should be distributed to Credit Bancorp's customers pursuant to the plan of partial distribution." Gov. Mem. at 42 *. Of course, the Court has not been called upon to decide the constructive trust issue as to these assets precisely because there is a stipulation. Nor has the Government raised a tracing argument with respect to the Post–Receivership Income.

plan. Rather, these proceedings concern whether Credit Bancorp has a property interest in the Protected Property to which a tax lien may attach in order to satisfy tax liability of Credit Bancorp.

Thus, the customers are entitled to a constructive trust as to the Post–Receivership Income.

### D. *The Relief Sought Is Equitable*

■ The Government also avers that Credit Bancorp's largest customer, SECO, was not an innocent victim and, therefore, is not entitled to the constructive trust remedy. This contention is based on evidence that SECO's due diligence, conducted in connection with the decision to invest with Credit Bancorp, revealed warning signs that Credit Bancorp's business was not what it was purported to be. *See Credit Bancorp X,* 2000 WL 1752979, at *35 (describing evidence of warning signs to SECO).

■ In undertaking an analysis of the equities, as is required in determining whether to impose an equitable remedy such as a constructive trust, the "innocence" of the victim is a relevant consideration. *See, e.g., In re Liquidation of the New York Agency and Other Assets of Bank of Credit and Commerce Int'l, S.A.,* 90 N.Y.2d 410, 660 N.Y.S.2d 850, 683 N.E.2d 756, 763 (1997) [hereinafter *"In re BCCI"*] (refusing to impose constructive trust on funds transferred by one bank into account at second bank, BCCI, because first bank "[could] not be portrayed as an innocent victim" and "chose to do business with BCCI at [its] own risk"); *see also Credit Bancorp X,* 2000 WL 1752979, at *35 (considering argument that custom-

ers who received warnings of fraud should be excluded from distribution plan, but rejecting approach as not constructive or consistent with equities under circumstances of case).[37]

The Government relies on *In re BCCI* for the proposition that a constructive trust is not warranted where the wronged party had notice of the risk. *See* 90 N.Y.2d 410, 660 N.Y.S.2d 850, 683 N.E.2d 756. However, *In re BCCI* involved a significantly greater degree of notice, in that the party seeking the constructive trust "knew or should have known that BCCI was a rogue bank whose operations had come under close scrutiny by both U.S. and British authorities." 660 N.Y.S.2d 850, 683 N.E.2d at 763. Moreover, if the Government's reasoning were adopted, it is not only SECO that would be at risk of losing out on the constructive trust remedy. *See Credit Bancorp X,* 2000 WL 1752979, at *35–*36 (noting various customers as to whom reliance issues would arise distinctions were to be made on this ground and concluding that "the better and more equitable approach is to recognize that all customers are similarly-situated ... innocent parties"). Such a result would not be equitable. In addition, the constructive trust is sought on behalf of all the customers, which is consistent with this Court's determination that the type of distribution to customers warranted by the equities is in essence a pro rata one. *See id.* (rejecting contention that some customers entitled to priority over others). Thus, it is not clear why notice to SECO should, as a matter of equity, accrue to the favor of the Government as opposed to the customers.[38]

**37.** "Innocence" is used here to refer to the reasonableness of the customer's reliance. *See Credit Bancorp X,* 2000 WL 1752979, at *35. The "unclean hands" doctrine, also referred to by the Government, has been distin-

guished by the Court in the context of this case as concerning a different set of issues. *See id.* at *35, *43–*44.

**38.** In *Blachy v. Butcher,* 221 F.3d 896 (6th Cir.2000), also cited by the Government, the

Finally, the Government maintains that the Receiver, as a fiduciary of "all persons interested in the receivership estate," *Phelan*, 154 F.2d at 991, may not elevate categorically the interests of Credit Bancorp's customers over the interests of the Government. This contention folds into the Government's arguments with respect to the Receiver's duties under 26 U.S.C. § 3713(b), and will be discussed in that context. *See* Section VI, *infra*.

### E. *The Relief Sought Is Needed*

The issue of whether the relief sought by the Receiver is needed as to the unmarshalled assets was previously addressed in the context of the Government's contentions regarding ripeness. The Government has also averred more generally, however, that the relief the Receiver seeks is not needed because all that is required in order to implement the partial distribution plan is to set aside some workable reserve for potential tax liability. Moreover, the Government maintains, the Receiver can obtain a determination as to the matters left unresolved by the Stipulation pursuant to a private letter ruling request and closing agreement request to the IRS.

The plan of partial distribution cannot proceed absent relief along the lines sought by the Receiver because the Stipulation does not protect customer assets from being used to pay the taxes of Credit Bancorp or any other defendant accruing after January 21, 2000, and it does not protect the customer assets from being used to pay taxes, if any, of the Receiver. The Receiver has postulated a potential Credit Bancorp tax liability in the tens of millions of dollars. The Government maintains that this is an exaggeration. There

is no basis upon which the Court at present could determine what the liability will be, nor is that the issue at bar. Under the circumstances, the only way for the plan to proceed absent the relief sought by the Receiver would be for the Receiver to make some estimate of this liability, set aside a reserve—which funds would increase the customers' Undertaking payments, and reduce their recovery—all the while proceeding under the shadow of personal liability for any tax owed in excess of the reserve. Such a course would be untenable. Therefore, the relief sought is needed because without it, and despite the Stipulation, the partial distribution plan cannot proceed.

### V. *The Use Of These Proceedings To Adjudicate The Receiver's Motion*

The Government contends that, to the extent Receiver's motion involves unmarshalled assets as to which tracing is required, the instant motion may not be resolved through "summary proceedings" although such proceedings have been found appropriate in equity receiverships. *See, e.g., CFTC v. Topworth Int'l Ltd.,* 205 F.3d 1107, 1113 (9th Cir.1999) (discussing use and benefits of summary proceedings in equity receiverships; *SEC v. Elliott,* 953 F.2d 1560, 1566–67 (11th Cir. 1992) (same)). More specifically, the Government maintains that it is entitled to additional time to conduct discovery and prepare its case. In support of this contention the Government relies on Federal Rule of Civil Procedure 66 and the Due Process Clause.

As previously explained, "unmarshalled assets" as defined by the Government include only the Blech Assets and the insur-

---

issue was whether to impose a retroactive constructive trust in favor of a wrongdoer's victims who were not diligent in discovering the true facts, where the IRS had a "properly

perfected" and "choate" tax lien. *See id.* at 906. There is no perfected tax lien here, making *Blachy* distinguishable.

ance proceeds. The determination of priority as to the insurance proceeds does not turn on issues of tracing. *See* Part III. B.2, *supra.* Thus, the Government's objection to the use of "summary proceedings" pertains only to the Blech Assets. As it has already been determined that this issue is not ripe for review, the Government's contentions regarding the use of "summary proceedings" need not be addressed.

## VI. *The Receiver's Obligations Under § 3713*

Under the Federal Insolvency Statute, 31 U.S.C. § 3713(b), the Receiver is personally liable for debts owing to the United States to the extent he pays the claims of another person before paying the United States. *See, e.g., United States v. Coppola,* 85 F.3d 1015, 1019–21 (2d Cir.1996). The Receiver seeks insulation from such liability through an order determining that the customers have priority over the Government as to the Protected Property, and through an order declaring that the Receiver has met his obligations under § 3713(b).

The Government maintains that the Receiver has an affirmative duty both to make a conscientious effort to determine the nature and extent of any potential tax liability, and to oppose any court order not providing for such payment. Indeed, the Government implies that the Receiver may be disregarding his duties just by making the instant motion.

In *King v. United States,* 379 U.S. 329, 85 S.Ct. 427, 13 L.Ed.2d 315 (1964), the United States sought to recover against the distributing agent of a debtor corporation who had distributed the assets of the bankrupt to other creditors ahead of the United States. *See id.* at 329, 85 S.Ct. 427. The Supreme Court held, under the predecessor statute to § 3713(b), that the distributor could be held personally liable for the unpaid portion of the Government's claim resulting from these actions, even though the distributor was acting under orders of the bankruptcy court. *See id.* at 339–40, 85 S.Ct. 427. However, in *King,* it was conceded that the Government had a "priority claim." *See id.* at 336, 85 S.Ct. 427. Moreover, the distributing agent failed to advise the bankruptcy court prior to the issuance of the distribution order of the potential unpaid claims to the government. *See id.* at 338, 85 S.Ct. 427. The Supreme Court noted that if the distributing agent had done so and the court had ignored the issue then "responsibility for the frustration of the Government's claim would have devolved completely upon the court, and we would be faced with a very different case." *Id.*

In this case, the Receiver has brought the issue of the Government's potential claim to receivership assets to the attention of the court, these proceedings are being conducted in order to determine whether the Government's claim takes priority, and the Government is participating in the proceedings. This situation is distinguishable from *King,* 379 U.S. 329, 85 S.Ct. 427, 13 L.Ed.2d 315. Instead, this situation is more akin to the one faced in *United States v. Pate,* 47 F.Supp. 965 (W.D.Ark.1942). In *Pate,* the United States submitted a claim against the estate of a deceased insolvent, and the attorney for the administrator of the estate presented the government's claim to the Probate Court as a "third class" claim. *See id.* at 966. The court allowed the claim as a "third class" claim and, as a result, other claims were paid first and the United States ultimately obtained only a fraction of the total amount claimed. *See id.* at 966–67. Later the government sought to recover the difference from the estate executor, arguing that "the defendant [execu-

tor] became a trustee of the Government and as such it was his duty . . . to appeal from the judgment of the Probate Court allowing the claim of the Government as one of third class, and . . . having failed to so appeal, he is now answerable to the Government for the amount remaining unpaid." *Id.* at 968. The court rejected this argument, noting the executor was "the trustee for all of the creditors," not just the government, and that since the government was a party "it became its duty, rather than [the executor's], to appeal, if it felt aggrieved by the order of the Court." *Id.* at 968–69.

The very issue before this Court is which claims take priority. It is neither conceded nor had it been determined, prior to the rendering of this decision, whether the Government's claim is a priority claim which must be paid first. Moreover, neither the language of the Federal Insolvency Statute nor the case law, including *King*, 379 U.S. 329, 85 S.Ct. 427, 13 L.Ed.2d 315, support the conclusion that the Receiver has a duty to ensure that the Government's claim is classified as a priority claim. As the Government itself points out, the Receiver is a fiduciary "with respect to *all* persons interested in the receivership estate." *Phelan*, 154 F.2d at 991 (emphasis added); *see also Pate*, 47 F.Supp. at 968–69.

This is not the first time in this litigation that the Receiver has been faced with competing interests. *See Credit Bancorp I*, 194 F.R.D. 457, 461 (S.D.N.Y.2000) (observing in relation to customers' competing claims to "limited receivership res" that "[t]he Receiver at once represents the interests of all and none of Credit Bancorp's customers . . . . To the extent that the Receiver the interests of all in mind, he is the adversary of the individual customer—whose concern is only for the return of his deposits"). The fact that at any given moment the Receiver may take a litigation position that some parties with interests in the estate find unfavorable to them does not mean he has neglected his fiduciary duties. For example, the Receiver opposed the motion by customers SECO and Gene W. Ray ("Ray") seeking to recover their assets ahead and to the detriment of other customers. *See Credit Bancorp X*, 2000 WL 1752979. The Receiver took the position that affording such relief to SECO and Ray would be inequitable, as well as contrary to other applicable law, and ultimately this Court agreed. *See id.* at *15–*26. The Receiver did not thereby violate his fiduciary duties to SECO and Ray. The authority invoked by the Government does not lead to the conclusion that the Receiver has greater obligations to it.

■ The Receiver has been making efforts to determine the nature and extent of any potential tax liability on the part of Credit Bancorp. The Receiver represents, and this representation is accepted, that he will pay Credit Bancorp tax liabilities to the Government to the extent there are Credit Bancorp assets available to do so. The fact that the Receiver has adopted the view that, under federal tax law and the law of constructive trust, the Protected Property is not subject to attachment to satisfy such liability, does not contravene the Receiver's obligations under the Federal Insolvency Statute, 31 U.S.C. § 3713(b). With a judicial declaration in place that the customers are entitled to a constructive trust, a transfer of the property by the Receiver to the customers will be a transfer of property from a possessor to its owners, not "paying any part of a debt of the . . . estate." 31 U.S.C. § 3713(b). Therefore, the Receiver is entitled to a declaration that in notifying the Court and the United States of the potential for tax liability, he has discharged his obligations under 31 U.S.C. § 3713(b), and

may not be held liable for effectuating a court-ordered plan of partial distribution.

### VII. *The Motion As To The States*

The taxing agencies of the States of California, New Jersey, and Kentucky have potential claims against Credit Bancorp for corporate income and/or franchise taxes due to the activities of Credit Bancorp's corporate offices in the respective states. Although the Receiver served both the November 8 Motion and the instant motion on the States of California, Kentucky, and New Jersey, the states have not responded. The applicable law, however, directs the conclusion that none of these states could properly impose a state tax lien on the Protected Property in connection with Credit Bancorp's tax obligations.

As in the federal context, the States of California, New Jersey, and Kentucky have statutory authority to impose liens for state tax liability. *See* Cal. Rev. & Tax Code § 19221(a) (West 1994); N.J. Stat. Ann. § 54:10A–16 (West 1986); Ky.Rev. Stat. Ann. § 134.420(2) (Banks–Baldwin 1998). However, as under federal law, the imposition of state tax liens is limited to the taxpayer's own property. *See* Cal Gov't Code § 7170(a) (West 1995); N.J. Stat. Ann. § 54:49–1 (West 1986); Ky.Rev. Stat. Ann. § 134.420(2) (Banks–Baldwin 1998). Therefore, as the Protected Property is subject to a constructive trust in favor of the Credit Bancorp customers, the state tax authorities may not attach tax liens to that property. *See Trustees of the Clients Sec. Fund of the Bar v. Miller*, 243 N.J.Super. 75, 578 A.2d 887, 892 (1989) (applying this rule under New Jersey law).

---

**39.** It is noted that although in the Stipulation the Government expressly reserves the right to assert a tax lien or to assert priority as to securities held in Credit Bancorp accounts that are not specifically identifiable as customer-deposited securities, the Government

### Conclusion

Therefore, for the reasons set forth above, the motion is granted in part and denied in part.[39]

Submit order on notice.

It is so ordered.

has not objected to the Receiver's motion on this basis. To the extent that the Receiver's motion encompasses such assets, i.e., assets not subject to the Stipulation but not objected to on this motion, it is granted.